**EMPIRE–PARK SQUARE LUMBER COMPANY, Libellant-Appellee,**

**v.**

**MANHATTAN LIGHTERAGE CORPO-RATION, Respondent-Appellant.**

No. 153, Docket 24615.

United States Court of Appeals Second Circuit.

Argued Jan. 16, 17, 1958.

Decided Feb. 13, 1958.

Burlingham, Hupper & Kennedy, New York City (Stanley R. Wright, New York City, of counsel), for appellant Manhattan Lighterage Corp.

Bigham, Englar, Jones & Houston, New York City (Owen C. Torrey, Jr., New York City, of counsel), for appellee.

Before MEDINA and MOORE, Circuit Judges, and GALSTON, District Judge.

GALSTON, District Judge.

This is an appeal from an interlocutory decree dated February 28, 1957, determining that libellant recover from respondent for a partial loss of and damages to a cargo of lumber.

In March of 1954, Manhattan Lighterage Company contracted with appellee Empire-Park Square Lumber Company, to transport a quantity of Empire's lumber from Port Newark, New Jersey, to Empire's yard on Newtown Creek, Brooklyn, New York. On March 16, 1954, the lumber was loaded aboard Manhattan's lighter, the "Ambassador," and at about 4:30 or 5:00 a. m., Manhattan's tug arrived at Empire's yard on Newtown Creek with the "Ambassador" and another lighter, the "Searsport."

Under the direction of the master of the tug, the "Searsport" was made fast to the bulkhead and the "Ambassador" was made fast to the offshore side of the "Searsport." So secured, the two lighters, moored side by side, occupied 68 feet of a waterway, which at that point is only 160 feet wide from bulkhead to bulkhead. The tug then departed leaving both lighters unattended until about 7:00 a. m., at which time the bargees reported for work. At that time the "Ambassador" was sinking, and in spite of the measures taken to try to save the lighter, she soon sank.

The condition of the lighter after it was raised was such as to lead to the con-

**166**

clusion that it had been squeezed; that is, that a passing vessel had come in contact with the port side of the "Ambassador" causing a fissure to open through which the leak occurred.

The Trial Court found the facts as noted above, except that there was no specific finding that the contact had been on the port side, and also found that the sinking of the vessel "Ambassador" was caused by the fissure occasioned either solely by the squeeze or by a combination of a squeeze and the generally poor condition of the lighter. The Trial Court found further that the berthing of the "Ambassador," extending out into the channel where there was increased danger of collision by passing vessels, was unreasonable, especially considering the fact that there was available a berth directly alongside the dock and that the lighter was loaded with relatively valuable cargo.

The "Ambassador" was moored with her starboard side to the port side of the "Searsport," so that the port side of the "Ambassador" was outboard. Both appellant and appellee offered evidence showing that there had been an indentation along the port side of the "Ambassador" caused by the squeeze. The appellee's expert testified that there was an indented area covering a large part of the port side of the vessel with a depth of from 2½ to 3 inches, and that in his opinion this indentation was caused by the hull of a passing tug. Appellant's marine superintendent testified similarly that he noted a dent along a fairly long area of the port side. This indentation must necessarily have been caused by contact with another vessel. Testimony was elicited that passing driftwood would not cause any such indentation.

The captain of the tug testified that the "Ambassador" could have been docked at the end of the "Searsport" instead of with one vessel outboard of the other. The captain of the "Ambassador" agreed that it would have been a safer spot if the "Ambassador" had been at the end of the "Searsport." Appellee's expert testified that the "Ambassador" should

not have been left unattended in its exposed position.

There was testimony, and the court below found, that Newtown Creek in the area of Bossert Terminal is a well traveled waterway, traffic being heavier at night than during the day. The waterway at that point is only 160 feet wide, of which the two lighters, moored with one outboard of the other, occupied 68 feet. A tug proceeding in the channel with a barge alongside would have little room to pass outboard of the "Ambassador."

Though there was testimony that it was customary not to leave a bargee aboard, there was also testimony that when on occasion the boat was left in an exposed position, the attendance of a bargee would be required. Though the presence of a man aboard would not have prevented the accident, at least the damage might well have been controlled by him.

■ In addition to the foregoing as pointing to negligence on the part of the appellant, the testimony of appellee's expert as to the condition of the vessel prior to the accident should be considered. Briefly, he said that the vessel had been leaking for a considerable time prior to the accident, the seams were open in many places, and the planks were partly deteriorated. The appellant herein was not only in control of the tug, but was also the owner of the lighter, and as such impliedly warranted the seaworthiness of the lighter. Work v. Leathers, 97 U.S. 379, 380, 24 L.Ed. 1012; Braker v. F. W. Jarvis Co., D.C., 166 F. 987.

Appellant argues that tiering barges in Newtown Creek is safe practice. Neither the testimony nor the findings of fact bear out this conclusion.

In the circumstances, since the waterway was narrow and well traveled in both directions, particularly at night, since there was available a berth directly alongside the dock, since no bargee was left aboard, and since the "Ambassador" was poorly maintained, there was sufficient proof to indicate that the berthing of the "Ambassador" outstream from the "Searsport" was unreasonable and was at least some obstruction in the channel.

In The Mary Ethel, D.C.E.D.N.Y.1923, 290 F. 458, affirmed 2 Cir., 1925, Bulger v. National Lead Co., 5 F.2d 1013, the tug made fast its tow to the outside of other boats so that the barge was exposed to the force of the tide due to which the lines by which the barge was secured parted. The tug was held liable for the ensuing damage.

In The May McGuirl, 2 Cir., 1919, 256 F. 20, the tug left her tow tandem to another barge instead of alongside as was possible. The lines parted, causing damage to the barge and her cargo. The tug was held at fault for failing to afford the barge a safe mooring.

These cases indicate the responsibility of the tug to provide a safe mooring.

Appellant has cited numerous cases indicating that it was the appellee's duty to provide a safe berth. These cases conclude that it is the consignee's duty to exercise diligence in ascertaining the condition of the dock and of the berth and to give notice of any obstruction or of any danger. Tracy v. Marks, Lissberger & Son, Inc., 2 Cir., 283 F. 100, 102; Sterns Lumber Co. v. John H. Rice Co., D.C., 260 F. 434, 437. However, in the case at bar, the condition of the dock or the safety of the berth was not challenged. The manner of using the berth was challenged.

Other cases cited by appellant, such as Jova Brick Works v. City of New York, 2 Cir., 277 F. 180, and Waldie v. Steers Sand & Gravel Corp., 2 Cir., 151 F.2d 129, show that where definite instructions are given by the man in charge on the dock as to the position in which the lighter is to be placed, the consignee is responsible. Here there is no evidence that anyone other than the captain of the tug gave instructions as to the position in which the "Ambassador" was to be berthed.

██ Much has been said by the appellant as to custom and general usage. Nevertheless, as was stated in Texas & Pacific Railway Co. v. Behymer, 189 U.S. 468, at page 470, 23 S.Ct. 622, at page 623, 47 L.Ed. 905:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."

██ There was sufficient evidence to support the findings of fact and to show that appellant was guilty of negligence.

Interlocutory decree affirmed.