**SPLOSNA–PLOVBA, a Corporation,**
**Appellant,**

v.

**Refugio GARCIA, Appellee.**

**No. 21525.**

United States Court of Appeals
Ninth Circuit.

Feb. 6, 1968.

Graydon S. Staring (argued), of Lillick, McHose, Wheat, Adams & Charles, Robert G. Partridge, Jr., of Partridge, O'Connell, Partridge & Fall, San Francisco, Cal., for appellant.

Hugh B. Miller (argued), of Jarvis, Miller & Stender, San Francisco, Cal., for appellee.

Before POPE, DUNIWAY and CARTER, Circuit Judges.

POPE Circuit Judge.

The appellee Garcia commenced this action by filing a libel against Splosna-Plovba for damages resulting from an injury incurred while he was working as a longshoreman aboard the latter's vessel the SS GUNDULIC. After trial, the court made findings of fact and conclusions of law holding the appellant corporation liable for damages and a final decree to that effect was entered.

Garcia was injured while he was working in the hold of the ship helping to

unload lumber. The lumber was stowed in bundles held together with metal strips. The length of the bundles varied from six to eighteen feet and the boards within the bundles varied in length. The bundles were approximately three feet high and three feet wide. Some of the lumber was stowed fore-and-aft and some was stowed athwartship. Because of these circumstances there were holes in the stow between the various bundles.

When he was injured Garcia was working with a group of four men in moving bundles from under the deck where they were stowed. These bundles were taken out by what is referred to as the two-sling method, that is to say, wire slings were placed about each end of the bundle and the operator of the winch on the deck of the ship would then drag the bundle toward the hatch and then lift the bundles upwards through the hatch for delivery on the deck. In using this method of unloading it was necessary for Garcia to hold one of the slings until the winch had started to lift the bundle. This was to hold the sling in place until the hoisting line began to take the load up, otherwise the hook by which it was fastened might come out. After the winch driver tightened up the bight of the line and the signal to start was given to him, Garcia and his companions were required to move quickly away from the load. In doing this at the time in question Garcia stepped into one of the holes in the lumber stow. Because the bundle was supported by a double sling, it could swing. It did so, and one end of the bundle struck Garcia's foot where it was caught in the hole, and Garcia received the fracture about which he complains.

■ The trial court held that the condition of the cargo stowage and the method of work which the longshoremen were required to employ in removing this cargo created an unseaworthy condition which was the proximate cause of Garcia's injuries. The key finding of the trial court was as follows: "Good practice in unloading a bundle of lumber required the bundle to be *dragged* from the wings to the square of the hatch by using a winch and sling to raise one end of the bundle, drag it in, set it there, resling it with two slings, and raise it vertically from the square of the hatch. Here, there was no place in the square of the hatch for the longshoremen to set the bundles for reslinging and raising. Thus, they were required to sling the bundles at each end in the wings and the winch driver had to swing them horizontally from the wings to the square of the hatch and raise them vertically. This was a dangerous method of discharging bundles of lumber because the winch driver had little or no control over the swinging bundles while he had substantial control over a bundle being dragged.

This condition of stowage required the libelant to hold the sling tight onto the hook while the line and sling were being taken up by the winch driver, and then to hurriedly get out of the way of the swinging bundle. In trying to get out of the way, libelant stepped into one of the holes and was struck on the ankle by a swinging bundle sustaining the injuries found herein."

While there are conflicts in the evidence, the record contains substantial credible evidence which warrants this finding of the trial court.

The evidence was to the effect that the proper and safe way to unload this lumber would have been to have the longshoremen operate in the square of the hatch in attaching slings to the bundles. Had the longshoremen been able to use the square of the hatch, it would have given them more room and a firm level place in which to work and when the bundle was ready to be hoisted the operator of the winch would have had better control over the bundle with less likelihood of its swerving and striking the workmen.

The evidence of a number of witnesses was to the effect that when Garcia went to work on the morning of March 20, the day he was injured, the bottom of the hold was covered with numerous boards and planks which in some manner had been knocked down or fallen into the bottom of the hatch. These boards lay

in an uneven pile such as might have been created through the breaking of bundles or in some manner which permitted the boards to form a completely irregular pile covering the entire bottom of the hatch. The testimony was that had these piles of boards not been there, then the slinging of the bundles for raising could have been handled in the square of the hatch. The foreman in charge of Garcia's gang testified that had this irregular pile of boards not been there, they would have removed the bundles from the ship by building a platform of pallet boards in the square of the hatch next to the timber to be removed, and at an appropriate level, so that using one sling on the bundles and dragging them to the working surface thus provided, the men attaching slings to both ends at that point, could operate in a safer location. Asked as to the reason for that procedure, the foreman replied: "Well, it gives the men more safety, safer to work, and also gives them a lot of room. . . . Well, when you drag it out, you drag the load out, it will give it more room, until you can have room so you can set the load out. You will have more room to bring it out." The same witness mentioned the advantage of the method he had preferred through the ability of the winch driver to control the load and to observe what was going on below if the fastening of the slings could have taken place in the square of the hatch. Under the system actually employed here, the bundle was fastened with the double sling as it lay in the wing of the ship, out of sight from the winch operator.

This foreman also testified that before the operation began on the day in question, he sent men down to attempt to remove the loose boards on the bottom of the hatch opening. He wanted to have it cleared out so he could have pallets there. At that time the walking boss stopped his efforts. "He told me to leave it go because, he said 'we will take the lumber off the top first, and then when you get down, then you can take that out.' "[1]

Garcia, testifying, described the common method of unloading lumber such as this, as follows: "You drag it out into the square of the hatch with one sling only and put your sling on the forward end and drag it right out into the square, and then you put a block under the load and then you put your other sling and hoist it out."

Although there was some testimony to the effect that there was no scattered lumber in the bottom of the hatch when the longshoremen went to work on this day, yet the condition of the ship at that point presented a question of fact for the trial judge to determine and his finding that there was no place in the square of the hatch for the longshoremen to set the bundles for reslinging and raising was amply supported by credible testimony, and in consequence the trial court could properly find that this created an unseaworthy condition. Indeed one member of the gang working with Garcia described the lumber piled below as being scattered about like match sticks; some of the boards being as much as 18 feet long and the shortest pieces 8 or 10 feet long. Another described it as "wedged and sticking up." The boards were still there when the crew quit work on that day.

■ This court has held that an improper method of handling cargo may amount to unseaworthiness. Blassingill v. Waterman Steamship Corporation, 336 F.2d 367, 369.[2] Since we hold that the

1. The foreman's account of this incident is confirmed by the stevedoring company's Daily Ship Report on the Gundulic for March 20, the day of the injury. The ship report for that day shows under the heading of "lost time" and "extra labor" that at 7:30 A.M., a half hour was spent designated as "Pick Up and Discharge Dunnage and Planks". This, the court could well believe, referred to the initial efforts of the gang foreman to move those planks out of the hatch bottom before he was stopped by the walking boss.

2. See, also, Mahnich v. Southern S. S. Co., 321 U.S. 96, 103, 64 S.Ct. 455, 88 L.Ed. 561, and discussion in Gilmore and Black, The Law of Admiralty, § 6–39.

**44**

findings of fact of the trial court are not clearly erroneous but are amply supported by testimony in the record, and since we agree with the court's conclusion that what occurred here amounted to unseaworthiness, the judgment must be affirmed.

It is so ordered.