Giacomo **LA CAPRIA**, as Administrator of the Estate of Santo La Capria, Deceased, Plaintiff,

v.

**COMPAGNIE MARITIME BELGE** and **William Spencer & Son Corp.,** Defendants.

**WILLIAM SPENCER & SON CORPORA·TION, Third-Party Plaintiff,**

v.

**TRANSOCEANIC STEVEDORING CORP., Third-Party Defendant.**

No. 62 Civ. 2874.

United States District Court
S. D. New York.
July 5, 1968.

Sylvia Miller, New York City, for plaintiff.

Hill, Betts, Yamaoka, Freehill & Longcope, by Thomas H. Healey, New York City, for defendant, Compagnie Maritime Belge.

Perrell, Nielsen & Stephens, by John Fuhrman, New York City, for William Spencer & Son Corp.

McLaughlin, Fiscella & Biancheri, by John J. Biancheri, New York City, for third-party defendant.

## OPINION

EDELSTEIN, District Judge.

This action arose out of an accident suffered by plaintiff's intestate, Santo La Capria, a longshoreman, on March 1, 1961, in the number two lower hold of the S.S. STEENSTRAETE. Defendant Compagnie Maritime Belge was the owner of the S.S. STEENSTRAETE. Defendant William Spencer & Son Corporation was the chenango or freight forwarder working a lighter which was moored at the same pier as the S.S. STEENSTRAETE. Third party defendant Transoceanic Stevedoring Corporation was the stevedore servicing the S.S. STEENSTRAETE and was also Santo La Capria's employer. Transoceanic was impleaded solely by Spencer and Spencer and Compagnie Maritime Belge cross-claimed against each other, each seeking indemnity. This court has jurisdiction under 28 U.S.C. § 1333.

It is undisputed that the accident occurred at approximately 11:30 a. m. when the deceased was struck on the back of his head and shoulder by a one-hundred pound sack of flour which fell from a pallet in the process of being lowered by a winch into the hold of the number two hatch. The preponderance of the credible evidence, considering oral testimony, depositions read into the record, and documents introduced in evidence, enables the court to reconstruct the events which led to the accident. The S. S. STEENSTRAETE was berthed at one side of Pier 14, North River, taking a cargo consisting of sacks of flour into its number two hatch. On the other side of Pier 14, Spencer was unloading sacks of flour from the Pennsylvania Railroad Lighter 440. Spencer's men were accomplishing their unloading operation by placing the sacks of flour on wooden pallets. Each pallet held twenty-four one hundred pound sacks. The sacks were in four tiers. Each tier consisted of six sacks, four of these sacks being placed side by side with their longer sides touching, and two sacks being placed with their shorter sides touching and their longer sides touching the shorter sides of the other four sacks. The first, second and third tiers were placed sack upon sack straight up, while the fourth tier was reversed to create a more stable pallet load. Each loaded pallet was then taken by a Spencer hi-lo fork lift to a designated spot on the pier. From that spot, each pallet was taken by a Transoceanic hi-lo to another spot on the pier. From this spot, a second Transoceanic hi-lo brought the pallet to the stringpiece where it was taken aboard the ship by means of the ship's gear. There is no claim that anything was wrong with the ship's gear or that the gear was other than fit and proper. At the stringpiece, a gang of four Transoceanic employees attached each pallet to the ship's gear to be hoisted aboard ship. This gang also had the task of examining each pallet load to make sure that it was a stable draft for hoisting purposes. As each draft came over the square of the hatch in which longshoremen were working, a gangwayman was assigned to shout a warning so that the men in the hatch would take cover and be out of harm's way if a sack were to fall.

The particular draft from which the sack of flour fell was approximately the thirtieth to be taken aboard the S.S. STEENSTRAETE at hatch number two that morning. Several Transoceanic employees testified that they were far from satisfied as to the condition of the pallet loads of flour which they were handling the morning of the accident. They objected to Spencer's method of tiering the sacks of flour on the pallets, three tiers of sacks bag upon bag and a fourth tier with its bags

reversed as to those bags in the tiers below. Plaintiff, Spencer and Trans-oceanic each called an expert witness to testify as to the proper method of loading sacks of flour on wooden pallets. A careful study of this expert testimony and an evaluation of the background and demeanor of the three experts impels to the conclusion that the best and safest method of tiering the sacks on the pallets would have been to reverse each tier and that a method of tiering in which only the third and fourth tier were reversed might also be safe and proper, but that the method used by Spencer in which only the fourth tier was reversed was not a safe and proper method of tiering. Although Spencer introduced testimony to show that it often tiered sacks of flour on pallets by reversing only the fourth tier, such testimony does not establish that the method was a safe one. See Texas & Pac. Ry. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903); City of New York v. McAllister Bros., Inc., 299 F.2d 227 (2d Cir. 1962); Santomarco v. United States, 277 F.2d 255 (2d Cir.), cert. denied American Stevedores, Inc. v. United States, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960); Empire-Park Square Lumber Co. v. Manhattan Lighterage Corp., 252 F.2d 165 (2d Cir. 1958); Petition of Skibs A/S Jolund, 250 F.2d 777 (2d Cir. 1957), cert. denied, Skibs A/S Jolund v. American Smelting & Refining Co., 356 U.S. 933, 78 S.Ct. 773, 2 L.Ed.2d 763 (1958); Troupe v. Chicago, D. & G. Bay Transit Co., 234 F.2d 253 (2d Cir. 1956); Gulisano v. American Export Lines, Inc., 212 F.Supp. 809 (S.D.N.Y.1962). This unstable method of tiering caused a sack to fall from its pallet and that sack struck Santo La Capria.

Since the trial in this case, the Second Circuit has decided Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961, rehearing denied 386 F.2d 444 (2d Cir. 1967), cert. denied, 390 U.S. 1027, 88 S. Ct. 1416, 20 L.Ed.2d 284, April 22, 1968, and Alexander v. Bethlehem Steel Corp., 382 F.2d 963 (2d Cir. 1967).

██ These cases hold that the operational negligence of the stevedore can render a vessel *pro tanto* unseaworthy. By allowing unstable pallet loads of flour to the hoisted aboard the S.S. STEEN-STRAETE the stevedore rendered the vessel unseaworthy in respect to Santo La Capria.

██ Compagnie Maritime Belge was also guilty of negligence. A ship owner owes a business guest or other invited person a safe place to work. United New York & New Jersey Sandy Hook Pilots Assn. v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); The M/V Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Connolly v. Weyerhaeuser Steamship Co., 236 F.2d 848 (2d Cir. 1956), rev'd on other grounds sub nom. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). The load from which the sack fell was approximately the thirtieth load of the morning. The vessel's officers either had actual visual notice of, or had ample time to observe, if indeed they did not, the improperly tiered loads coming aboard ship. A ship's hold with unstable pallet loads coming overhead is not a safe place to work.

██ Plaintiff's claim against Spencer is based upon the allegation that Spencer tiered the sacks of flour improperly on the pallets. While originally, in his trial memorandum, plaintiff based his theory of recovery both on negligence and the breach of an alleged warranty of workmanlike service which plaintiff claimed Spencer owed to the ship, it now appears from its noninclusion in plaintiff's post-trial memorandum, that this latter ground has been abandoned. In any event, as will be discussed later in this opinion, this alleged warranty of workmanlike service running from Spencer to the ship does not exist. Plaintiff cites no cases for the proposition that Spencer is liable to him and thus brushes over the possibility that Spencer may have owed no duty to guard plaintiff's deceased from improperly tiered pallet

loads of flour. If Spencer had no such duty, it is not liable. See Prosser, Torts § 53 (3d ed. 1964). The preponderance of the credible evidence clearly indicates that Spencer's obligation with regard to the flour ended when the Spencer hi-lo placed the flour on the pier. From that point, Transoceanic had the duty to guard those who might come in contact with the flour from physical harm. In addition, it is basic Hornbook law that mere negligence is not enough to establish liability. Such negligence must be the proximate cause of the harm which befalls the injured. See Prosser, op. cit. supra, § 52. In the case at bar, the preponderance of the credible evidence leads to the conclusion that the failure of Transoceanic to perfom its job properly was the proximate cause of Santo La Capria's injury. If Transoceanic had properly checked the pallet loads, the improperly tiered flour would not have been hoisted aboard the S.S. STEEN-STRAETE and the accident would not have occurred.

The above discussion of proximate cause in no way negates this court's finding that the S.S. STEEN-STRAETE's unseaworthiness and Compagnie Maritime Belge's negligence were the proximate cause of Santo La Capria's accident. It must be remembered that Transoceanic's operational negligence caused the ship to be in an unseaworthy condition and made the lower hold of the number two hatch an unsafe place to work.

As noted earlier in this opinion, Compagnie Maritime Belge and Spencer have cross-claimed against each other. Compagnie Maritime Belge bases its claim for indemnity upon the breach of Spencer's alleged warranty of workmanlike service. A warranty of workmanlike service in maritime law runs from a contractor performing a ship's service to a ship. Such warranties are based upon implied contracts between ships and contractors servicing them. In the case at bar, the preponderance of the

credible evidence establishes that Spencer was under contract with the Pennsylvania Railroad to unload its lighters and was in no way under contract with the S.S. STEENSTRAETE and, furthermore, that Spencer was not engaged in performing the ship's service but was instead "performing the railroad's service." For a discussion of indemnity under maritime law see Norris, Maritime Personal Injuries §§ 49–61 (1959). Compagnie Maritime Belge places great reliance upon Williams v. Pennsylvania R. R., 313 F.2d 203 (2d Cir. 1963). That reliance is misplaced, although coincidentally Williams also involved Spencer. In Williams, Spencer, in charge of unloading a Lehigh Valley barge, made use of a Pennsylvania hoister. A hoister is a scow which carries a crane. During this operation, the plaintiff on the hoister was injured and he recovered against the Pennsylvania on the grounds that the hoister was unseaworthy. The Second Circuit held that the Pennsylvania was entitled to idemnity even though Spencer was engaged by the Lehigh Valley. The court stated that "since the Lehigh Valley owed the Pennsylvania a duty of due care in the use of the hoister to unload the barge, and since Spencer by unloading the barge in compliance with its warranty of workmanlike service would be satisfying that duty of the Lehigh Valley, it seems reasonable to regard the Pennsylvania as a third-party beneficiary of the warranty." Id. at 211. In the case at bar, the Pennsylvania, the owner of the lighter which Spencer was working owed no duty to the S.S. STEEN-STRAETE in regard to how the pallet loads of flour were handled. In contrast to the Williams case where Spencer was in complete charge of the unloading operation, in the case at bar, Transoceanic was in charge of the loading operation which resulted in Santo La Capria's injury.

As opposed to Compagnie Maritime Belge, which vigorously pressed its cross-claim, Spencer appears to

have abandoned its cross-claim against Compagnie Maritime Belge. Its post-trial memorandum is devoid of any reference to the cross-claim. In any event, the cross-claim is groundless. Spencer's rather confused allegation of indemnity appears to be that it is somehow a beneficiary of the ship's warranty of seaworthiness. The ship, however, warrants seaworthiness only to those connected with it. Just as Spencer made no warranties to the ship, the ship made no warranties to Spencer.

In addition to cross-claiming against Compagnie Maritime Belge, Spencer impleaded the stevedore, Transoceanic. Since Spencer is not liable to the plaintiff, it might be said that there is nothing for which to indemnify Spencer. In maritime cases, however, a successful defendant is entitled to recover its counsel fees from the third-party defendant even in the event that the plaintiff loses his case against the defendant, if the defendant was put to the expense of defending the suit because of the third-party defendant's breach of its warranty of workmanlike service to the defendant. Massa v. C. A. Venezuelan Navigacion, 332 F.2d 779 (2d Cir.), cert. denied 379 U.S. 914, 85 S.Ct. 262, 13 L. Ed.2d 186 (1964). In the case at bar, however, there was no contract, either express or implied, between Transoceanic and Spencer. There being no contract, Transoceanic cannot be held to have warranted anything to Spencer. Cf. Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

Now that it has been established that Compagnie Maritime Belge is solely liable to the plaintiff, it must be determined whether plaintiff's deceased was guilty of contributory negligence. The burden of showing that Santo La Capria was guilty of contributory negligence is on the defendant. Gypsum Carrier, Inc., v. Handelsman, 307 F.2d 525, 528, 4 A.L.R.3d 517 (9th Cir. 1962); United States v. Smith, 220 F.2d 548, 554 (5th Cir. 1955); 2 Norris, Seamen § 684 at p. 847 (1962). The preponderance of the credible evidence has failed to show that Santo La Capria was guilty of contributory negligence. The testimony of the gangwayman, Frank Castellano, clearly indicates that he gave his warning too late for Santo La Capria to take cover. Since he knew of no approaching danger, Santo La Capria's failure to take cover cannot be deemed sufficient to find him guilty of contributory negligence to any degree.

Santo La Capria was seriously injured as a result of his accident. He was taken unconscious from the ship to the Beekman Downtown Hospital. His condition was diagnosed as cerebral concussion, contusion of the spinal chord with quadriplegia, fracture of the mandible and teeth and shock. While he was in the hospital, he underwent a laminectomy, a tracheostomy, and a myelogram. La Capria required a catheter to aid in urination. He was discharged from the hospital on December 15, 1961. He was unable to speak for some time and he never did regain the ability to speak normally. By the time of his discharge, La Capria could walk with a support but for safety's sake he walked with another person's assistance. He remained under his doctor's care, seeing him once a week. He also received physiotherapy and dental treatments. His doctor prescribed tranquilizers because he suffered from marked spasticity. La Capria suffered pain most of the time. He was readmitted to the hospital on November 23, 1962, and he remained there until May 11, 1963. He was placed in traction because of neck and shoulder pain. To increase the traction, holes were bored in La Capria's skull and a Crutchfield Tong was inserted. The placement in traction was supplanted by the fusion of his cervical spine from $C_3$ to $C_7$. He was then placed back in traction with the Crutchfield Tongs until the fusion became solid. During this time La Capria was forced to remain strapped to a Stryker Frame. After he was no longer re-

quired to be on the Stryker Frame he underwent physiotherapy to learn to walk with crutches. At that time he wore a collar. When this second hospital stay ended, La Capria saw his doctor twice more. He was admitted to the hospital a third time on June 3, 1963, for urinary tract infection. This infection arose from a difficulty in relieving himself which La Capria suffered as a result of his accident. He was discharged on June 9, 1963. He continued to see his doctor and went back to the hospital for a fourth time on December 23, 1963, suffering from a urinary tract infection similar to the one which necessitated his third hospital stay. He was released on January 10, 1964, and he then continued to see his doctor. He was admitted a fifth time, suffering from carcinoma of the gall bladder from which he died on May 23, 1964. Although plaintiff originally claimed damages for wrongful death, plaintiff now concedes that Santo La Capria's death was not caused by his accident of March 1, 1961. Counsel have agreed that the medical expenses which arose out of the accident totaled $27,309.-64. Although there was some objection to the necessity and reasonableness of some of the charges for various physicians during the hospitalizations, the reasonableness of the charges and the necessity for these physicians' services which resulted in those charges were amply demonstrated by the testimony of Dr. Kenneth C. Sze of the Beekman Downtown Hospital who was in charge of La Capria's case.

■ Santo La Capria was out of work from March 1, 1961, until he died on May 23, 1964. This is a period of 168 weeks. Due to the fact that La Capria was away from the United States for six or seven months during the years 1959 and 1960 and the fact that he worked only two months in 1961, his average weekly income is best established by taking his earnings from April 1, 1960, through March 1, 1961. During this period he earned $6,445.00. His average weekly income was therefore approximately $135.00 and his total lost wages was $22,680.00.

■ Santo La Capria was in pain almost continuously following the accident. He had four hospital stays totaling approximately sixteen months. He underwent several long operations. He was subjected to Crutchfield Tongs and a Stryker Frame. In addition, he was extremely spastic in each of his four extremities after recovering from several months of paralysis. He lost the power of speech for some time and he never regained normal speech. He was unable to comb his hair, light a cigarette, dress himself, or tie his shoes. Damages for pain and suffering are assessed at $168,000.00.

■■ In addition to damages for medical expenses, lost wages and pain and suffering, plaintiff requests that prejudgment interest be awarded as well. Although this court has the power to award pre-judgment interest, Petition of the City of New York, 332 F.2d 1006 (2d Cir.), cert. denied, City of New York v. Bernstein, 379 U.S. 922, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964), the court in its sound discretion declines to do so in this case. See Candiano v. Moore-McCormack Lines, Inc., 251 F.Supp. 654, 661 (S.D.N.Y.1966), aff'd 2 Cir., 382 F.2d 961, rehearing denied 386 F.2d 444 (2d Cir. 1967), cert. denied, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284, April 22, 1968.

It is the judgment of this court that plaintiff recover from Compagnie Maritime Belge the sum of $217,989.64; that Spencer is not liable to plaintiff; that neither Compagnie Maritime Belge nor Spencer recover on their respective cross-claims against one another; and that Spencer not recover from Transoceanic.

The foregoing constitute the required findings of fact and conclusions of law.

So ordered.