Moses SLAUGHTER, Jr., Plaintiff,

v.

S. S. RONDE et al., Defendants.

Civ. A. No. 3151.

United States District Court,
S. D. Georgia,
Savannah Division.

Sept. 11, 1974.

James E. McAleer, Jr. (Downing, McAleer & Gaskin), Savannah, Ga., for plaintiff.

David S. Sipple (Chamlee, Dubus & Sipple), Savannah, Ga., for defendants.

## OPINION AND ORDER

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

. LAWRENCE, Chief Judge.

### I. *The Litigation*

This is an action brought under general admiralty and maritime law by a longshoreman seriously injured while working aboard the S.S. "Ronde" which was taking in cargo at the ITC docks at Savannah. The defendants are the vessel and her owner, Fyffes Group Ltd.[1]

The injury to plaintiff occurred when he and other employees of Strachan Shipping Company were moving a heavy roll of linerboard into the storage position in a tween-decks hold. In some way, Slaughter was pinned between the roll and a stanchion located at a corner of the "square of the hatch". His injuries permanently incapacitated him for further work as a longshoreman.

Plaintiff was injured on January 25, 1973, which was after the effective date of the 1972 amendment to the Longshoremen's and Harbor Workers' Compensation Act abolishing the sixteen-year-old doctrine enunciated by the Supreme Court in Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. Under the *Ryan* rule a longshoreman injured while working aboard a vessel was accorded the benefit of the same implied warranty of shipworthiness to which a seaman was entitled. The so-called *"Sieracki* seaman" (Seas

---

1. The compensation carrier of Strachan Shipping Company, the stevedore, intervened in the action to recover payments made to plaintiff under the Longshoremen's and Harbor Workers' Act.

Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099) no longer has a right of action against the vessel "based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred". The injured longshoreman can now sue the vessel only for negligence. See 33 U.S.C. § 905(b).

The present action began as a typical *Sieracki*-type claim with allegations of unseaworthiness and negligence. On motion of the defendants, the allegation as to unseaworthiness was stricken. The case proceeded to trial before the Court without a jury on the theory of negligence by the shipowner in failing to furnish plaintiff a safe place to work. Plaintiff contends that the raised hatchcover in hold No. 2 of the tween-deck to which the rolls of the linerboard were lowered in conjunction with the considerable listing of the ship and the uneven condition of the wooden "gratings" or "slats" that overlay the decking [2] caused the heavy linerboard roll to get out of control and to twist around or angle with the result that plaintiff was pinned against a stanchion.

The case was tried on August 15th–16th. The testimony presented by the plaintiff consisted, in addition to himself, of that of two physician witnesses and six longshoremen who were working in the hold at the time of the injury. The "header" of the gang testified as the "Court's witness". The defendants' witnesses included the Chief Officer of the vessel, the Stevedore Foreman of Strachan Shipping Company, the official in charge of terminal operations and an expert witness on the subject of cargo storage.

## II. *Discussion of Law*

The purpose and the effect of the 1972 amendments to the Longshore-

men's and Harbor Workers' Compensation Act are clearly blueprinted, in length and detail, in the Report of the Committee, House of Representatives, which considered the proposed legislation. "The purpose of the amendments," it states, "is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like." However, while persons to whom compensation is payable under the Act no longer may bring a damage suit against the vessel or its owner under the judicially-enacted doctrine of unseaworthiness, they still have the right to recover damages for negligence.

The Committee pointed out that vessels have been held to what amounts to absolute liability by decisions of the Supreme Court, commencing with Seas Shipping Co., Inc. v. Sieracki, *supra*, which decided that the traditional seaman's remedy based on the breach of the vessel's absolute, nondelegable duty to provide a seaworthy vessel was also available to longshoremen and others who performed work on the vessel which by tradition has been performed by seamen. The Committee rejected "the thesis" that a vessel should be liable without regard to its fault for injuries sustained by employees covered by LHWCA while working on board. However, nothing in the legislation was "intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." Thus, for example, "where a longshoreman slips on an oil spill on a vessel's deck and is injured,

---

**2.** The "Ronde" was a refrigerated ship that was usually engaged in the banana trade. The 3-inch high "gratings" covering the deck of the cargo holds served to permit ventilation from below and to prevent damage from any water that might accumulate. The "Ronde" had transported linerboard in the past. The "gratings" protected the linerboard from any moisture resulting from condensation.

the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances."

The Committee recognized that there would be disputes as to whether the vessel was negligent in a particular case and that such issues could only be resolved "through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties."

See 3 U.S.Code Congressional and Administrative News, 1972, pp. 4703–4704.

■ Under the amended Act, a longshoreman can no longer recover against the ship by reason of negligence of a stevedoring contractor in methods of loading or unloading which render the ship unseaworthy. See Splosna-Plovba v. Garcia, 390 F.2d 41 (9th Cir.); Ryan v. Pacific Coast Shipping Co., 448 F.2d 525, 526 (9th Cir.); Baker v. Cristobal, 488 F.2d 331 (5th Cir.). Under the maritime law as it existed before the effective date of the 1972 amendments, a shipowner could be found guilty of negligence where the officers see or have actual visual notice of, or ample time to observe, unsafe stevedoring operations since it does not represent a safe place to work. La Capria v. Compagnie Maritime Belge, 286 F.Supp. 980 (S.D.N.Y.); aff'd. as to such holding in 427 F.2d 244 (2nd Cir.). That basis for liability still exists since, as stated, Congress did not intend to "derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition".

It has been predicted that under the 1972 amendments the admiralty bar will be more "notice" conscious when analyzing and investigating their cases and that "Involvement of vessel's officers and crew and equipment will be a primary concern". See Francis J. Gorman, "The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments". 6 Journal of Maritime Law and Commerce (October, 1972), p. 17.

In the present case the second and third mates of the "Ronde" were ansigned to the particular cargo watch. Their primary duty seems to have been to make sure of proper stowage of the cargo looking to its safety and that of the ship. Safety of longshoremen working aboard the vessel appears to have been a secondary consideration as far as the watch officers were concerned. Such was regarded as the function of the Stevedoring Company which had control of the physical stowing of cargo and the methods used by its longshoremen. Theoretically, if the ship's personnel observed anything dangerous in the methods used by the stevedore and the longshoremen, they could stop the operation. By the same token, the longshoremen could complain to the stevedore foreman about working conditions. They could refuse to work and go home. They sometimes did so when they considered conditions in the hold unsafe.

Here it claimed that the ship's officers charged with the watch saw and knew about the dangerous conditions of cargo handling, namely, the slope from the top of the hatch combing to the deck (nearly 11°) and the listing of the vessel on its offshore side. Those factors combined with others made the place of work unsafe for the plaintiff. I will deal with this hereafter in the Findings of Fact.

■ The concept of liability to a seaman or longshoreman injured aboard a ship as a result of negligence by the vessel is completely different from liability as a result of unseaworthiness. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499, 90 S.Ct. 940, 25 L.Ed.2d 114. Lack of seaworthiness results in liability

without fault while liability in the former case depends on failure of the vessel or owner to exercise reasonable care. Unseaworthiness is a *condition*. How it came into being, whether by negligence or otherwise, is irrelevant to the shipowner's liability for personal injuries resulting therefrom. 70 Am.Jur.2d Shipping § 12.

In Fedison v. The Vessel Wislica, 382 F.Supp. 4 (E.D., La., Civil Action No. 73–1030) which was rather similar in its facts to the case now under consideration, the District Court observed that plaintiff was trying to circumvent the express intent of the 1972 amendments. Judge Heebe stated that the imperfections in the stowage of cargo may have been sufficient to have rendered the vessel unseaworthy, but that the facts did not show negligence on the part of the vessel or shipowner with respect to the conditions in the hold, including cracks that had developed between the crates. The Court held that the duty to discover and remedy same was that of the stevedore which had control over the work being done in the hold and that the vessel was not negligent for any breach of duty owed by the stevedore.

■ However, Congress has left intact the right to recover for liability of a vessel based on negligence where a longshoreman is injured while working aboard a vessel. The fact that some defective or dangerous condition makes her unseaworthy does not prevent a recovery if the owner is negligent in knowingly permitting same to exist. Of course, negligence may be alleged and proved although the condition might also constitute unseaworthiness. However, the burden is on the injured party to prove negligence on the basis of Federal law.[3]

## III. FINDINGS OF FACT

1. The S.S. "Ronde" is a vessel of British registry. She was built in 1945. The "Ronde" is owned by Fyffes Group Ltd. of London. She has a gross tonnage of approximately 6,300 tons, a length of 455 feet and beam of about 60 feet.

2. The "Ronde" is a refrigerated vessel and is known as a "banana" ship. While ordinarily used in that trade, she has transported linerboard and other cargo on occasions. She had carried a banana cargo to Baltimore and stopped at Savannah to take on the cargo of linerboard.

3. The agent of the vessel at Savannah was Strachan Shipping Company. It employed a gang of longshoremen to load the rolls of linerboard in the four empty holds of the vessel.

4. Linerboard appears to be the outer strip used in corrugated boxes. It is shipped in rolls about four to five feet in height and usually varying from five to seven feet in length. Each roll weighs from one and a half tons to five tons.

5. The linerboard is hoisted by crane aboard the vessel in a rope sling with a lead wire. The roll is lowered through the hatch to the particular hold where the stowage takes place. After freeing the roll from the sling, longshoremen (four or five, the Court gathers) maneuver the roll from the square-of-the-hatch area into proper stowage position in the wings. The accident occurred in No. 2 hold on the tween deck level of the "Ronde".

6. On the flooring of the holds lie removable wooden "gratings" or "slats". They are about three inches in height and six by eight feet in dimension. They serve the dual purpose of furnish-

3. " . . . the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law." 3 U.S. Congressional and Administrative News, 1972, p. 4705.

ing ventilation from below as well as preventing contact of the banana cargo with any water in the hold. When linerboard is transported, the rolls are stored on top of the grating which prevents damage by moisture that might accumulate on the decking.

7. There are facilities aboard the "Ronde" for continuous repair operations of the grating by the ship's carpenter. Two thousand feet of wood for such use was aboard the vessel in question.

8. The area of the square of the hatch is approximately thirty feet by fifteen feet. The hatchcover over the square of the hatch between No. 2 hold and the hold below was in place. It and the coaming extend approximately three inches above the level of the wings in the hold where the injury occurred. This elevation prevents flow of water into the hold below. In cargo vessels built in the last ten or fifteen years the cover is constructed so as to lie flush with the decking of the hold. The gratings or slats covering the decking of No. 2 hold are nearly level with the top of the hatchcover. As a result, there was a difference in level of approximately seven inches.[4] The other gratings reduce this to three inches. The difference in level is bevelled to an angle of about ten and three-quarters degrees by use of a wedge-shaped grating. It is about sixteen inches long and fits tightly against the combing around the raised hatchcover.

9. Two rows of supporting stanchions or "pillars" run parallel to the square of the hatch in the tween deck. They are located approximately nine feet apart. After a roll of linerboard is lowered into the hold it is maneuvered by the longshoremen between the stanchions to the stowage position in the wings. Plaintiff testified that the injury occurred when the roll came off the slope of the hatchcover and rolled faster than usual because of a list of the vessel with the result that it could not be held by the longshoremen. The bevelled slope, according to Slaughter, caused the roll to twist so as to get out of control. In a discovery deposition, plaintiff previously testified that he did not know how the roll turned but that it twisted and jammed him to the pole. Dep., p. 6.

10. According to Earl Edwards, who was working with plaintiff, the ship was listing offshore and the workers had to hold the roll which was hard to control. In his words, "We was rolling it, but since the ship wasn't level, it twist, and we couldn't stop that roller, and none of us—any of us couldn't stop it, because it too heavy. What it was doing, it was a steel post and the linerboard tilt—hit swinging around and we tried to stop it and it was going into the post and he got caught right between the post and the linerboard." Edwards testified that the ship listed thirty degrees although he added that he was not sure. He further said that the "crates" had holes; were not level and that he complained about the holes in the slats but not as to the "leaning" of the vessel.

11. The ship's log which was introduced in evidence contained no notation in respect to listing of the vessel during the time cargo loading was in progress. The header of the gang, W. C. Drayton, gave a written statement three months after the accident in which he stated that he noticed no listing of the vessel at the time of the accident but that it was possible during the loading of this type of cargo for the ship to list "slightly" due to the weight of the rolls. The witness Maxwell had signed a statement a few weeks after the occurrence in which he stated that "The ship was not listing noticeably at the time of the accident." The Master of the vessel, Colin Robertson Leitch of Devon, was aboard the "Ronde" throughout the day of the accident. He testified that he noticed

4. I take it that the gratings are left in the square-of-the-hatch area to protect the rolls from contact with the steel decking on being lowered into the hold. Captain Colin Robertson Leitch, Master of the "Ronde", testified to that effect.

no list of the vessel and that two to three degrees would not be an abnormal list at dockside. David R. Williams who is a Stevedore Foreman of Strachan Shipping Company worked on the shift from 8:00 A.M. to 4:30 or 5:00 P.M. on the day of the accident. He noticed no listing during that time. He testified that if he had noticed any "dangerous list" he would have gone to the mate or captain; investigated the condition, and ordered work stopped until it was corrected.

12. According to Stevedore Foreman Williams, the loading of the cargo in the holds of the "Ronde" was carried out in such a manner as to prevent listing. Captain Jennings, the Marine Surveyor, testified that a two-ton roll of linerboard would not cause a list nor would two rolls simultaneously loaded on the same side have such effect. Forty tons on one side of the vessel would cause a list of one degree. Captain Leitch's testimony was that the cargo was equally distributed on the port and starboard sides and that the cargo was stable. He said that to get a list of one to one and one-half degrees would require 45 to 50 tons to be loaded on that side of the vessel. On cross-examination, the Master testified that he was unable to say what side of the vessel the cargo was located on reaching a particular hold.

13. It is not uncommon, according to Williams, to load linerboard on a refrigerated ship having a grate flooring. He has done so as often as twice a month at Savannah. An expert witness for the defendant, Marine Surveyor Harry E. Jennings, testified that it was common for such vessels to transport linerboard.

14. Stevedore Foreman Williams testified that he observed nothing out of order as to the gratings in the hold where the injury to plaintiff occurred. It was the practice of Captain Leitch to personally inspect every level of each hold before turning the vessel over to the stevedore for loading and he did so on January 24th. He found no defective gratings. Twenty to thirty minutes after the injury to the plaintiff, the Master went down into No. 2 hold and made an inspection. It included the possibility of existence of broken gratings. He saw none. When the discovery deposition of Mr. Slaughter was taken he was asked whether the grating was broken in any way or whether it appeared to be weak. His answer was, "Not that I can remember." Dep., p. 25.

15. Longshoremen had in the past come to Stevedore Foreman Williams to complain about unsafe conditions aboard a vessel. No complaints were lodged with him on the day of injury. It is not unusual for a longshoreman displeased with conditions to ask for his "card" and to go home. No one complained to him or to the ship's officers as to unsafe conditions on January 25, 1973.

16. It is the custom at the port of Savannah for the stevedore employer to have full control of the handling of the cargo. Normally, the ship's officers exercise no active control over such operation. The primary responsibility for the safety of longshoremen-employees is on the stevedore. Such was the testimony of Charles W. Pidgeon, Stevedore Superintendent of Strachan Shipping Company. The ship's personnel do not direct how to handle a particular piece of cargo, according to Stevedore Foreman Williams.

17. The officer personnel of the "Ronde" consisted of the Master and three mates. The second and third mates were assigned to cargo watch the day of the accident. According to Captain Leitch, they make periodic checks during the loading operation. The chief concern is the proper place of stowage of the cargo and that no unsafe practices are followed. They may complain of any unsafe loading practices to the stevedore. The ship's officers exercise no supervisory control over the area in which the longshoremen are working abord the ship. However, in respect to the safety of the ship and location of placement of the cargo in the holds, the master of the vessel has the final say-so.

IV. *Comments Preliminary to Findings of Fact as to Ultimate Factual Issues*

Up to this point, I have reviewed evidence rather than found facts. The Court has not come face to face with ultimate fact-findings—the determination of the issue of negligence and liability. All I have done is set the stage for determining the ultimate facts by finding "subordinate facts upon which the ultimate factual conclusion must rest". See O'Neill v. United States, 411 F.2d 139, 146 (3rd Cir.); Humphrey v. Southwestern Portland Cement Company, 488 F.2d 691, 694 (5th Cir.). I have not even resolved the question of how the accident occurred. Somehow, plaintiff was pinned against the stanchion. But the evidence, including plaintiff's own testimony, leaves much to be desired as to exactly how the unfortuante incident occurred. Those who were engaged in handling the roll of linerboard are at best vague and at worst speculative in describing what happened. I will assume, for present purposes, that the heavy roll of linerboard in some way acquired momentum after it was released from the sling in hold No. 2 and that the longshoremen were not able to control it.

The imperial issue of fact is, was the shipowner negligent? But subsidiary to that question are various considerations of both law and fact with which this Court must deal, among them the shipowner's legal duty to a longshoreman and the stevedoring contractor's control and responsibility as to the loading operation.

Plaintiff contends that the shipowner was negligent in that

(a) The ship had a sharp list which constituted an unsafe condition and which required the work to be suspended by the ship's officers.

(b) The gratings in hold No. 2 were defective and produced a dangerous situation in conjunction with the "mass-pillaring" construction in the hold and the elevation of the coaming and hatchcover.

(c) Control of the longshoring work aboad the "Ronde" was under direction of ship's personnel and they were negligent in permitting the unsafe operation to continue.

These claims require at this point a look at the relevant law. My somewhat disjointed approach to these Findings of Fact may not conform to the liturgical rites established by Rule 52, but we have mixed questions of law and fact which sanction unconventionality.

V. *Discussion of Law Relevant to Determination of Ultimate Facts*

In this Court's earlier mention of the 1972 amendment to the Longshoremen's and Harbor Workers' Compensation Act, it was noted that prior to its enactment a shipowner could be found guilty of negligence where the officers of the vessel see or have actual visual notice of, or ample time to observe, unsafe stevedoring operations. La Capria v. Compagnie Maritime Belge, *supra*; Williams v. Shipping Corporation of India, Ltd., 354 F.Supp. 626, 630 (S.D., Ga.). "The ship has no duty to actively supervise loading work, but if the ship has knowledge of a condition dangerous to the longshoremen or, in the exercise of ordinary care it would have had such knowledge, it owes them a duty to use reasonable care to prevent injury to them." Price v. SS "Yaracuy", 378 F.2d 156, 161 (5th Cir.).

Under the 1972 amendment, negligence is still a basis of liability, for, as seen, it was not the intention of Congress to "derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition".

Reasonable care does not require ship's officers to inspect each hold daily to be sure that the "stevedore has properly performed the work which it was hired to perform and that they inspect so thoroughly that they discover a danger which is not readily apparent and which is not appreciated by the longshoremen themselves". Williams v.

Bowring Steamship Company, Ltd., 1972 AMC 890, 897 (D., Conn.).

I previously cited Fedison v. The Vessel "Wislica" in which District Judge Heebe said that "The duty to discover and remedy a dangerous condition caused by the holes and cracks which often develop between crates in the stow was clearly one of the responsibilities of the stevedore . . . which had control over the work being done in the hold. The vessel is not negligent for the breach of a duty owed by the stevedore." It has also been held that "The physical handling of an ordinary bale or bundle is the clearest example of a detail within the special competence and peculiar responsibility of the stevedoring contractor" and that such is "clearly . . . not the province or responsibility of the ship". Knox v. United States Company, 294 F.2d 354, 358 (3rd Cir.).

■ Counsel are at odds over whether the 1972 LSHWCA amendment land-based principles of negligence law are applicable as opposed to maritime standards under which the duty to provide a safe place to work was held to be non-delegable. Counsel for plaintiff argues that, despite the legislative history of the statute, the maritime law has to be given national uniformity with respect to such nondelegable duty. Neither the legislative history of the 1972 legislation [5] nor the subsequent decisional law sustain plaintiff's position. In Lucas v. "Brinknes" Schiffahrts Ges, et al. and Farro v. Eternity Carriers, Inc. et al., 379 F.Supp. 759 (E.D., Pa. August 5, 1974) a three-judge panel in the Eastern District of Pennsylvania said:

"In providing for the third-party suit against the vessel for its negligence, Congress perceived that it was eliminating the large number of cases in which the vessel was held liable without fault pursuant to the doctrine of seaworthiness. This perception was based on the assumption that the negligence remedy provided would be similar to the common law concept based on fault and not any maritime negligence concept in which the vessel owed some special duty to provide the longshoreman a safe place to work."

Even prior to the amendment, where negligence was relied on for recovery, a violation of the duty to furnish a longshoreman a safe place to work depended on fault. See in this connection, Vickers v. Tumey, 290 F.2d 426, 432 (5th Cir.); 80 C.J.S. Shipping § 85, p. 827.

## VI. *Findings of Ultimate Facts*

■ 18. The linerboard cargo was properly distributed in the five holds during the course of the loading operation and the vessel was stable. This Court finds that there was no abnormal list. It credits the testimony to that effect by the Master of the "Ronde" and the stevedore foreman of the stevedoring contractor whose responsibilities included taking proper measures in the case of unsafe conditions. The witnesses were emphatic as to absence of any list beyond the expected and normal range.

19. Plaintiff's evidence as to the list is not persuasive. The testimony of the longshoremen to that effect is contradicted in some cases by prior inconsistent statements of the witnesses. The unreliability of the claim of an abnormal list is illustrated (although not typified)

---

5. "The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances." 3 U.S.Code Congressional and Administrative News, 1972, 4704. In short, the new cause of action created by Congress is founded on "traditional land-based negligence concepts in lieu of the application of the general maritime law remedies of negligence and unseaworthiness." Hite v. Maritime Overseas Corporation, 380 F.Supp. 222 (E.D.Texas, 1974).

by a witness who testified that it could have been thirty degrees. If that were true, the schematic drawing below will reflect how the "Ronde" sat in the river alongside the dock at the time of the injury.[6]

20. Absence of excessive list is confirmed by the fact that none of the longshoremen who worked abroad the "Ronde" on January 25, 1973, complained to the stevedore foreman or to any ship's officer concerning unsafe conditions. Even if the claim of presence of defective gratings were sustained by the evidence, plaintiff has failed to show that such condition proximately contributed to the inability to properly maneuver or to contain the roll which caused the injury. The evidence as to causation is conjectural, unclear and indefinite.

21. It is possible that the roll came off the beveled slope and gained momentum through the normal list of the vessel with the result that it could not be controlled by the longshoremen engaged in stowing it. But plaintiff does not contend that the raised hatchcover and surrounding coaming amounted to negligence by itself. And it does not. That fact and the presence of the stanchions bordering the square of the hatch represented a static and known physical condition. The only inconstant involved was the human factor and that was a responsibility which primarily belonged to the stevedoring contractor. The control of the longshoremen and their work was Strachan's and not the shipowner's business. Under the existing circumstances,

6. See Rivers v. Angf. A/B Tirfing, 450 F.2d 12, 15 where the Fifth Circuit said: "All of plaintiff's witnesses testified that the vessel was severely listed between 25 and 50 degrees. Tirfing's witnesses were apparently short in numbers but long in credibility. They testified that if what Rivers claimed were the truth, a virtual state of chaos would have existed aboard the vessel: pots and pans would fly; the cargo would have fallen and could not have been moved; water would have flowed out of the sanitary facilities."

the vessel's officers had no duty to oversee and supervise the manner in which the longshoremen handled a particular piece of cargo. Numerous other rolls had been safely stowed in the wings.

22. Plaintiff's theory is that the physical conditions in the hold (together with the list of the "Ronde") created an unsafe place for the longshoremen to perform their work. This Court finds that there was no negligence by the shipowner or its personnel in that or other respects.

## VII. *Conclusions of Law*

1. Plaintiff has failed to carry the burden of proving that defendant was negligent.

2. The preponderance of evidence disproves negligence by the defendant. This is so whether its liability is adjudged by land-side standards (which control here) or by principles of general maritime law.

3. Numerous rolls of linerboard had been stowed without mishap on the day of the accident. If the injury resulted from inadequate supervision by the stevedore in respect to handling a roll, no vicarious liability of the ship could be predicated upon unseaworthiness. See St. Claire v. Mid-Continent Barge Lines Co. et al., 249 F.Supp. 938 (D., Minn.). While a claim of unseaworthiness could be based on the stevedore's failure to furnish "adequate personnel" (Baker v. S/S Cristobal, *supra*, 488 F.2d 331), the facts here fall short of imputability of fault in that respect to the vessel.[7] Furthermore, " 'Instant unseaworthiness' resulting from 'operational negligence of the stevedoring contractor is not a basis for recovery by an injured longshoreman." Luckenbach Overseas Corporation v. Usner, *supra*, 413 F.2d 984 (5th Cir.), aff'd. 400 U.S. 494, 90 S.Ct. 940, 25 L.Ed.2d 114.

Judgment for the vessel and her owner will accordingly be entered.

---

7. Unseaworthiness may result when a seaman is injured because an inadequate crew was assigned to perform a task in a safe and prudent manner. See Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724; Orient Mid-East Lines, Inc. v. A Shipment of Rice, 496 F.2d 1032, 1040 (5th Cir.). However, while Mr. Slaughter was a "*Sieracki* seaman" under maritime law prior to the 1972 Amendment, the situation is different in an action claiming negligence in supplying insufficient personnel. The injured party was employed by an independent stevedoring contractor whose primary duty it was to furnish an adequate number of employees to perform the loading of cargo. I add that in the present case plaintiff does not appear to rely on any such theory of fault by the vessel.