**Mario LUBRANO, Plaintiff-Appellant,**

v.

**ROYAL NETHERLANDS STEAMSHIP COMPANY, Defendant-Appellee.**

No. 104, Docket 77–7211.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1977.
Decided Feb. 15, 1978.

Moore, Circuit Judge, dissented and filed an opinion.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, of counsel), for plaintiff-appellant.

William M. Kimball, New York City (Burlingham Underwood & Lord, New York City, of counsel), for defendant-appellee.

Before LUMBARD, MOORE and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Mario Lubrano, a longshoreman, appeals from a judgment in the United States District Court for the Southern District of New York, Charles S. Haight, Jr., J., directing a verdict for defendant shipowner, Royal Netherlands Steamship Company, in this negligence action brought under 33 U.S.C. § 905(b). Examination of the record indicates that the district judge removed from the jury's consideration an issue of fact presented by ambiguous testimony. Since this was error, we must reverse for a new trial.

I

The facts are in large part undisputed and, with the exception already referred to, are admirably set forth in the trial judge's memorandum opinion granting judgment to defendant. We therefore state the facts briefly, reserving fuller discussion for what we regard as the crucial issue. Plaintiff was injured on December 27, 1972, while loading greasy drums of tallow in the hold of defendant's vessel. Plaintiff was employed by Northeast Stevedoring Company, which was performing stevedoring duties for defendant Royal. While loading a second tier of drums upon the first tier, plaintiff allegedly slipped on the greasy drums and fell. The theory of plaintiff's case was that his fall was caused by the absence of dunnage (pieces of rough lumber or plywood), which was supposed to be supplied by defendant. The insufficiency of dunnage had become apparent during the course of the work and had been called to the attention of Willie Joe Ashley, plaintiff's hatch boss, and Pete Spano, a stevedore foreman and Ashley's immediate superior. Both Ashley and Spano were employed by Northeast Stevedoring Company. They, in turn, called the problem to the attention of a ship's officer, since the dunnage was supplied by the ship.

At this point, although only plaintiff and Ashley testified, the parties disagree as to what the record indicates next occurred. In his written opinion, the judge viewed the evidence as showing that the ship's officer advised Spano and Ashley, in substance,

> that those in charge of the vessel were aware of the need for more dunnage; that more dunnage had in fact been sent for; and that the longshoremen should

hold off on working in the hold until the additional dunnage arrived.

As will be seen below, plaintiff characterizes this version of the facts as unwarranted. It is undisputed, however, that Spano told Ashley that the men in the hold should not be kept idle, should continue to work and "do the best they can," that Ashley relayed these instructions to plaintiff and his colleagues, and that thereafter plaintiff slipped and fell. On this theory of the facts, the judge directed a verdict for defendant at the end of plaintiff's case. This appeal followed.

## II

■ Plaintiff sues under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, which produced significant changes in the law governing remedies for longshoremen injured on their jobs. The amendments relevant here have been fully discussed in several recent decisions of this court, e. g., *Munoz v. Flota Merchante Grancolombiana, S.A.*, 2 Cir., 553 F.2d 837, 839–41 (1977); *Landon v. Lief Hoegh and Co., Inc.*, 2 Cir., 521 F.2d 756, 762–63 (1975), cert. denied, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976), and need not be extensively examined again. It is enough for our purpose to recognize, as the parties do, that a longshoreman may still recover for damages caused by the negligence of a shipowner, 33 U.S.C. § 905(b),[1] and that "Congress suggested land-based

principles of negligence as the standard of care for vessels boarded by dock workers." *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 507 (2d Cir. 1976).

Carrying out that congressional intent, we held in *Napoli* that the standard for determining the liability of a ship to a longshoreman, who had fallen from unsecured plywood boards on a load of drums, was found in Section 343A of the Restatement of Torts, reproduced in the margin.[2] Since there was evidence in that case from which a jury might conclude that the shipowner had "notice of an obviously dangerous condition" and that "the ship should reasonably have anticipated that Napoli would not be able to avoid the danger despite its .obviousness," id. at 509, we reversed for a new trial and a proper charge.[3] Still more recently, however, we emphasized that under "land-based principles . . . a shipowner cannot be held liable for a dangerous condition created by an independent stevedore unless he has actual or constructive knowledge that the condition exists." See *Ruffino v. Scindia Steam Navigation Co., Ltd.*, 559 F.2d 861, 862 (2 Cir. 1977). Accord: *Munoz v. Flota Merchante Grancolombiana, S.A.*, supra; *Bess v. Agromar Line*, 518 F.2d 738 (4th Cir. 1975).

We turn now to apply these principles to this case. As indicated above, it is undisputed that a ship's officer was notified of

1. Section 905(b) provides:

   In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or

   repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter. (Emphasis supplied).

2. Section 343A states, in pertinent part:

   A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

3. Appellee points out that the ship in *Napoli* was also the stevedore. We do not regard that as rendering inapplicable here the legal rules quoted above.

the shortage of dunnage, that the ship acknowledged its responsibility to supply dunnage, and that at the time of the accident, it was attempting to do so. The trial judge, however, ruled as a matter of law that the ship "had no reason to anticipate that the longshoremen would not await the additional dunnage . . ." Appellant argues that on the record before the judge, this conclusion was unwarranted.

■ The key support for plaintiff came from his hatch boss, Ashley. The latter testified, in substance, that when the men in the work gang noticed that they needed dunnage, he spoke to someone on the ship, whom he identified as an officer. In the course of his testimony, Ashley first apparently quoted the officer as follows: "[T]hey said we had wait and do the best we can until it [the dunnage] arrive." Then, becoming more specific, Ashley testified that the officer said: "We had to do the best we can until we get something that we could work with." The trial judge then asked the witness, "Who said that?" and Ashley replied: "This was come from the stevedore and the ship. We couldn't keep the 18 men standing by doing nothing until the plywood arrived." Ashley then testified that in the following hour, he saw the same officer walking "back and forth on the ship constantly." It is true that in other parts of his direct testimony, Ashley quoted the ship's officer as stating merely that "they had ordered [the dunnage] and they had to wait for it." And in Ashley's cross-examination, a similar direction to Spano, Ashley's superior, was attributed to the ship's officer. This helps to explain why the trial judge viewed the evidence as supporting defendant rather than plaintiff. Thus, in several places in his opinion, the judge referred to the shipowner's "suggestion" that the men hold off working until the dunnage arrived. This characterization of the officer's statement was the basis of the judge's holding that the ship could not reasonably apprehend that work might continue and an injury occur.

However, as the above analysis of the record indicates, the evidence could have been interpreted differently. Even though the record was sparse and the testimony supporting plaintiff on this issue was ambiguous and unimpressive, it was enough to allow a jury to conclude that the ship's officer approved and joined in the direction that the men keep working, although the dunnage was not there. Had a jury so found, it might also have concluded, as we said in *Napoli*, "that the ship should reasonably have anticipated that . . . [plaintiff] would not be able to avoid the danger despite its obviousness." 536 F.2d at 509. It is as true here, as it was in that case, that

. . . it might be argued that if this was the only place for . . . [plaintiff] to work and carry out his job, the vessel might reasonably anticipate that he would use it despite its obvious danger, since the only alternatives would be to leave his job or face trouble for delaying the work. Should the jury be persuaded by this argument and find that the shipowner was negligent in not correcting the open and obvious danger but that the plaintiff was contributorily negligent, if would apply the doctrine of comparative negligence to reduce the shipowner's liability proportionately.

Id.

We do not know what the true facts are or what more probing examination at a new trial may obtain from the same witnesses or from others, like Spano, who did not testify. If the evidence shows only that a ship's officer told the longshoreman to stop working until the dunnage arrived, thereby fulfilling the ship's duty to the longshoreman, there would be no case for the jury. But if there is again evidence that a ship's officer, after being notified of the open and obvious danger of insufficient dunnage for a slippery cargo, had the men keep working or joined in the stevedore's decision to do so, then there would be a jury question.[4]

---

4. We do not agree with our dissenting brother's attempt to overrule *Napoli v. Hellenic Lines*,

*Ltd.*, 536 F.2d 505 (2d Cir. 1976), nor with his analysis of *Munoz v. Flota Merchante Granco-*

Judgment reversed and case remanded for a new trial.

MOORE, Circuit Judge (dissenting):

The fallacy of the majority opinion is to be found in the last sentence thereof, namely, "But if there is again evidence that a ship's officer, after being notified of the open and obvious danger of insufficient dunnage for a slippery cargo, had the men keep working or joined in the stevedore's decision to do so, then there would be a jury question." The fallacy is that an order by a ship's officer to a stevedore in whose hands had been placed the exclusive control of the loading operation, and who had exclusive authority to direct its employees as to when and under what conditions they should work with respect to awaiting the arrival of additional dunnage and continuing work in the meantime under conditions known to stevedore and shipowner alike to be dangerous, placed negligence liability on the shipowner rather than on the stevedore whose employee was injured.

## I.

## FACTS

Before a trial judge is faulted for an error it is well to consider the facts and the applicable law upon which he made his decision.

Plaintiff, Mario Lubrano, was a longshoreman employed by a stevedoring company, Northeast Stevedoring Company ("Northeast"). Northeast had been engaged by the shipowner, Royal Netherlands Steamship Company ("Royal") to load cargo into its ship, the "S. S. CHIRON". Lubrano was Northeast's employee, hence was covered by Northeast's compensation insurance. Northeast was an independent contractor and had complete charge of, and responsibility for, the loading operation.

The cargo being loaded by Lubrano's gang consisted of metal drums containing tallow. The drums were slippery. Some dunnage (wooden boards) was supplied by the shipowner as was its responsibility, but as the work progressed it became apparent to the stevedore that there was insufficient dunnage to cover the first tier of drums. The longshoremen called this deficiency to the attention of their boss, Willie Joe Ashley, who in turn so informed the stevedore's foreman, Spano. Ashley and Spano told one of the ship's officers of the necessity for more dunnage. Ashley was told that additional dunnage had been ordered and that "you had to wait until it arrived". (49a). The "you" is clarified by Ashley's testimony. In answer to the question "Who told you that you had to wait?" he said, "Well, the stevedore says that the ship— that the Dutch had ordered the lumber and it hadn't arrived so we had to continue working until it gets there. * * * When I say wait I don't mean that he said that we should stop work. We had to do the best we can until it got there". (50a). To make identification even more certain that it was the stevedore who gave the orders, there ensued the following:

"Q. This was the stevedore who told you that?

A. Yes.

Q. Who was the stevedore on that ship that day, which foreman?

A. Pete Spano.

Q. Petey Spano said to you, in about these words, that the ship had ordered the dunnage, you had to wait a while till the dunnage came, but meantime the men should continue working and do the best they could under the circumstances?

A. Yes.

Q. Of course, Petey Spano was your boss, is that right?

A. That's right.

Q. So he having said that to you, you did what he told you to do, as best you could, right, you relayed the same in-

*Iombiana, S. A.*, 553 F.2d 837 (2d Cir. 1977); we believe that the precedents he cites from other circuits are not relevant here. Even more significantly, not one of the many cases cited in the lengthy dissenting opinion states that a shipowner cannot be held negligent under the new law, when the shipowner both had knowledge of an open and obvious danger and also affirmatively joined in a stevedore's decision to keep the longshoremen working nonetheless.

structions to the men in the hold, they had to do the best they could, 'Keep working, do the best you can, those are the orders,' is that right?

A. That's right." (50a–51a)

However, Ashley had previously testified that when he had asked for more dunnage he was told (presumably by a ship's officer): "We [the stevedore] had to do the best we can until we get something we could work with." (42a).

Thereafter Lubrano was injured when he slipped on a greasy drum not covered by dunnage.

I find no basis in the record for the majority's conclusion that the shipowner, through an officer, had interjected itself into supervising the stevedoring operation by giving orders that the stevedore should continue to work on the drums despite absence of dunnage [it was Spano who told Ashley to do the best "they could under the circumstances"]. The most that can be said for the words "we had to continue working until it gets there" is that they constituted advice to the stevedore to keep working. However, this was not an order from someone in charge of the loading operation, and it was the stevedore's sole responsibility thereafter to direct its employees how, where and under what circumstances they were to continue to work. Even assuming an officer had said that the work should continue, this statement cannot be regarded as an attempt to take the stevedore's control of the loading operation and of its own employees out of its hands.

The focal point of error in the majority opinion is to be found in its contrary-to-fact assumption, which in turn is contrary to the law, that if there is evidence that a ship's officer "had the men keep working or joined in the stevedore's decision to do so, then there would be a jury question".

The factual error is the assumption that the shipowner retained the power to direct the stevedore's employees after having given the stevedore, as an independent contractor, complete control over the loading operation. The error as a matter of law is in holding that a shipowner, having so relinquished the control to the independent contractor, must stand by to countermand the stevedore's directions lest it be charged with joining in. The law, as evidenced in the 1972 Amendments to the LHWCA and the many cases decided since the Amendments, is to the contrary.

## II.

### LEGISLATIVE INTENT

Despite Congressional intent in enacting the 1972 Amendments to the LHWCA [1] thereby (1) to give substantially increased benefits to injured longshoremen and (2) to clarify the legal situation created by the so-called *Sieracki-Ryan* cases, the holding of the court today takes the law a long step backward toward the strict liability doctrine of yesteryear.

Under *Seas Shipping Co., Inc. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), by court-created law, the doctrine of strict liability to seamen was extended to longshoremen upon a theory of unseaworthiness.[2] And shipowners were held to be liable for unseaworthy conditions even if the unseaworthiness was caused by the independent stevedore, rather than the vessel or a member of the vessel's crew. Some years later and possibly to ameliorate the result of this situation, it was held in *Ryan Stevedoring Co., Inc. v. Pan Atlantic S. S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), that the shipowner could recover from the stevedore damages for which it was liable, on the theory that the stevedore

1. Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, P.L. 92–576, 86 Stat. 1251 *et seq.* (Oct. 27, 1972).

2. A concept stretched by the courts to far-fetched lengths during ensuing years. *See, e. g., Dillon v. M. S. Oriental Inventor*, 426 F.2d 977 (5th Cir. 1970) (fellow longshoreman's knee gave way, causing a bale to fall upon plaintiff); *Bryant v. Partenreederei-Ernest Russ*, 330 F.2d 185 (4th Cir. 1964) (warped board furnished for construction of grain feeder); *Reddick v. McAllister Lighterage Line*, 258 F.2d 297 (2d Cir. 1958) (cargo crate broke when longshoreman stood on it).

had breached its implied warranty of workmanlike performance to the vessel.

The background and the necessity for the 1972 legislation cannot be more concisely or better stated than by Chief Judge Kaufman within the year in *Munoz v. Flota Merchante Grancolombiana, S. A.,* 553 F.2d 837 (2d Cir. 1977), who said:

"In an effort to bring order out of chaos, Congress amended the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) in 1972 to clarify and limit the circumstances under which the employee of a stevedore could recover damages from a shipowner for on-the-job accidents." 553 F.2d at 838.

\*　　\*　　\*　　\*　　\*　　\*

". . . Congress, by its extensive overhaul of the LHWCA in 1972, sought to achieve several goals: adequate, increased and sure compensation for injured longshoremen, elimination of the rubric of liability without fault for shipowners, and encouragement of safety within the industry by placing the duty of care on the party best able to prevent accidents." 553 F.2d at 839.

**3.** H.Rpt.No. 92–1441, 92d Cong., 2d Sess. 2 (1972) [hereinafter H.Rpt.], reprinted in 3 U.S. Code Cong. & Admin.News pp. 4698, 4700 (1972).

**4.** The Committee Reports indicate:

"The Committee heard testimony that the number of third-party actions brought under the *Sieracki* and *Ryan* line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs. Industry witnesses testified that despite the fact that since 1961 injury frequency rates have decreased in the industry, and maximum benefits payable under the Act have remained constant, the cost of compensation insurance for longshoremen has increased substantially because of the increased number of third party cases and legal expenses and higher recoveries in such cases. The Committee also heard testimony that in some cases workers were being encouraged not to file claims for compensation or to delay their return to work in the hope of increasing their possible recovery in a third party action. The Committee's attention was also called to the decision in 1966 of the

The 1972 legislation was to remedy "the anomalous situation [which] arose in which the stevedore, whose participation in a workmen's compensation scheme precluded direct actions for negligence by his employees, became liable, nevertheless, in a court of law for the very injury that the compensation system was designed to remedy." 553 F.2d at 839–40.

Placing a high potential liability on either the shipowner or stevedore was not unjustified because the LHWCA then limited longshoremen's compensation to a maximum of $70 per week.[3] However, a major concern was that the initial liability was on the wrong party—the shipowner was strictly liable for accidents where it had little or no control over the actual operations. Also, the administrative costs of high legal fees and burdens on the courts created a system that was in dire need of reform in 1972.[4] The ultimate decision reached by Congress was not made lightly. Instead, the result reflects a delicate balancing by Congress of the interests of the various parties involved. The longshoremen received increased benefits, the shipowners are liable only if negligent, and the stevedore does not face the *Ryan* secondary suit.[5]

United States district court in Philadelphia concerning the impact of third party claims involving injured longshoremen on the backlog of personal injury cases in that court." S.Rpt.No. 92–1125, 92d Cong., 2d Sess. 9 (1972) [hereinafter S.Rpt.], H.Rpt. at 5, 3 U.S.Code Cong. & Admin.News pp. 4702–03 (1972). The reference is apparently to *Turner v. Transportacion Maritima,* 44 F.R.D. 412 (E.D.Pa.1968). *See Marant v. Farrell Lines, Inc.,* 550 F.2d 142, 148–49 n. 2 (3d Cir. 1977).

**5.** The Senate Report states the nature of the compromise:

"For a number of years representatives of the employees have attempted to have the benefit levels under the Act raised so that injured workers would be properly protected by the Act. At the same time, employer groups indicated their willingness to increase such payments but indicated they could do so only if the Longshoremen's and Harbor Workers' Compensation Act were to again become the exclusive remedy against the stevedore as had been intended since its passage in 1927 until modified by various Supreme Court decisions." S.Rpt. at 5.

In analyzing the basis for the legislation, due consideration must be given to the express aim of Congress to force employers (stevedores) to be more responsive to safety considerations in their work.[6] The stevedore has the primary responsibility to avoid accidents. *Riddle v. Exxon Transportation Company*, 563 F.2d 1103 (4th Cir. 1977); *Marant v. Farrell Lines, Inc.*, 550 F.2d 142, 144 (3rd Cir. 1977); *Lucas v. "Brinknes" Schiffahrts Ges.*, 379 F.Supp. 759, 768–69 (E.D.Pa.1974); *Ramirez v. Toko Kaiun K. K.*, 385 F.Supp. 644, 653 (N.D.Calif.1974). The stevedore is in the best position to avoid the costs and causes of accidents, and on its shoulders rests the primary responsibility for the safety of longshoremen. Such responsibility is consistent with the promotion of safe working conditions and economic efficiency. The stevedore is also the party best able to spread the cost of accidents through insurance or through higher charges for work performed.[7] *See generally*, G. Calabresi, *The Costs of Accidents* (1970).

Congress intended that the LHWCA should be applied uniformly nation-wide, and comparative negligence would apply, while assumption of risk would not apply, to longshoremen.[8] Also, Congress intended

The Report later states that
"given the improvement in compensation benefits which this bill would provide, it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness." *Id.* at 10.

The history of the 1972 Amendments has been discussed in more detail in recent cases in this and other circuits. *See, e.g., Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837, 839–41 (2d Cir. 1977); *Landon v. Lief Hoegh and Co., Inc.*, 521 F.2d 756 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir. 1975); *Hurst v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.), *cert. denied*, 434 U.S. 861 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977).

6. In increasing benefits to injured workers, Congress intended to provide an incentive to the stevedore to provide a safe place to work. The Senate Report states:
"It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.

"This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means to be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry, and such means clearly include vigorous enforcement of the Maritime Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement." S.Rpt. at 2.

7. The stevedore may balance the cost of accidents with the cost of instituting measures which will reduce accidents. By forcing stevedores to pay higher amounts of compensation to longshoremen under the 1972 Amendments, stevedores are forced to take into account the Congressionally determined cost of accidents. A stevedore will take precautions to reduce accidents to a point where the cost of reducing accidents in the form of additional safety measures equals the cost of accidents in terms of lost time and benefits which must be paid. The stevedore is then in a position to spread the cost of the compensation benefits or insurance through higher prices. The cost of stevedoring services will then reflect their true economic cost, including the cost of paying benefits to those injured on the job. Those stevedores who have worse safety records will have higher prices or will be forced to accept lower profits. Customer shipowners will tend to hire the relatively lower priced stevedores who have superior safety records. Overall, accidents will be reduced and economic efficiency will be promoted.

8. The Committee Reports state:
"*Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. In that connection, the Committee intends that the admiralty concept of comparative negligence, rather*

the application of negligence law to be based on land-based principles.[9] The application, by analogy, of land-based principles does not require courts to develop rules of law for interpretation of the LHWCA which are identical to land-based tort law. To the contrary, land-based concepts must be used to fashion rules applicable to maritime situations and reflecting Congressional intent.

## III.

## COURT INTERPRETATIONS

Courts have looked to the Restatement (Second) of Torts for guidance in formulating the land-based principles of negligence law. This circuit and other circuits have followed the modern rule of law provided by § 343A of the Restatement.[10] However, § 343A must be read in light of the intent of Congress in enacting the 1972 Amendments. The basic rule found in § 343A is that no liability will arise for obvious defects, and is based on notions of assumption of risk.[11] The escape clause provided in the last phrase of § 343A(1) is expressly designed to avoid in traditional tort situations the harsh consequences of assumption of risk and contributory negligence. The doctrine of assumption of risk is specifically excluded from LHWCA actions, and com-

parative negligence, not contributory negligence, is applied. Furthermore, in a land-based tort action, one who is held liable can receive contribution from another concurrent tortfeasor, while the LHWCA precludes contribution from the stevedore tortfeasor. In short, the special characteristics of the LHWCA preclude unthinking adherence to § 343A alone or to a literal reading thereof.

Section 343A also must be read together with § 409 of the Restatement. In fact, § 409 dealing specifically with "Independent Contractors" should be the more applicable section. Section 409 states: "Except as stated in §§ 410–29, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants". Restatement (Second) of Torts, § 409 (1965). Under this section, with certain exceptions, the landowner is not liable *per se* for the negligent acts of an independent contractor.[12] "If §§ 343–43A were applied to create a duty in the shipowner to apprise himself of, to warn the longshoremen of and to protect them [from] dangerous features of the independent contractor's —i. e., the stevedore's—activity then the Restatement sections dealing with employer control of the activity of independent con-

than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury. Also, the Committee intends that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable." (emphasis added). 3 U.S.Code Cong. & Admin.News p. 4705 and S.Rpt. at 12.

9. See, e. g., Gay v. Ocean Transport & Trading Co., supra at 1237–38; Hurst v. Triad Shipping Co., supra at 1247; Napoli v. Hellenic Lines, Ltd., 536 F.2d 505 (2d Cir. 1976); Butler v. O/Y Finnlines, Ltd., 537 F.2d 1205, 1206 n. 2 (4th Cir. 1976).

10. E. g., Ruffino v. Scindia Steam Navigation Co., Ltd., 559 F.2d 861 (2d Cir. 1977); Munoz v. Flota Merchante Grancolombiana, S. A., supra; Napoli v. Hellenic Lines, supra; Gay v. Ocean Transport and Trading, Ltd., supra; Anuszewski v. Dynamic Mariners Corp., 540 F.2d 757

(4th Cir. 1976), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

11. Comment e to § 343A states in part:

"The possessor of the land may reasonably assume that [the invitee] will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them." See § 496A, Comment d.

12. Stevedores are independent contractors within the meaning of the Restatement. Hurst v. Triad Shipping Co., supra at 1249; Teofilovich v. d'Amico Mediterranean/Pacific Line, 415 F.Supp. 732, 735 (C.D.Calif.1976); Frasca v. Prudential-Grace Lines, Inc., 394 F.Supp. 1092, 1098–99 (D.Md.1975).

tractors, §§ 409–26 would be rendered nugatory with respect to landowners-shipowners." *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1249–50 n. 35 (3d Cir. 1977).[13]

When analyzed, prior cases, in this circuit and others, are consistent with the view that a longshoreman's claim against the shipowner normally should not be permitted when the ship has relinquished control of the operation which led to the injury. *See Ruffino v. Scindia Steam Navigation Co., Ltd.*, 559 F.2d 861 (2d Cir. 1977) and *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d 837 (2d Cir. 1977). In the present case, appellant argues that the exception of § 414 of the Restatement applies.[14] However, there is no proof in the record of the retention of any control by the shipowner or facts from which any reference thereof might be drawn. Appellant contends that at any time the CHIRON's crew could have ordered the work halted, and that Royal breached a duty of reasonable care to ensure that the work was performed properly, but the appellant presented no evidence indicating that the crew of the CHIRON participated in, controlled or even had a right to control the operative functions of loading. The facts establish the contrary.

The stevedore was an expert in loading and unloading operations. Royal could reasonably expect that Northeast, which "was in a far better position than the shipowner to avoid the accident", would use its expert knowledge "to adopt preventive measures and thereby to reduce the likelihood of injury". *Italia Societa v. Oregon Stevedoring Co.*, 376 U.S. 315, 323, 324, 84 S.Ct. 748, 753, 754, 11 L.Ed.2d 732 (1964). The handling of tallow drums is the type of task that is within the expert competence of the stevedore.[15] The court in *Slaughter v. S. S. Ronde*, 390 F.Supp. 637 (S.D.Ga.1974), *affirmed*, 509 F.2d 973 (5th Cir. 1975), noted that

"it has also been held that 'The physical handling of an ordinary bale or bundle is the clearest example of a detail within the special competence and peculiar responsibility of the stevedoring contractor' and that such is 'clearly . . . not the province or responsibility of the ship'." (Citation omitted) *Id.* at 645.

The stevedore can stop work, and has the responsibility to stop work, when dangerous conditions arise. The stevedore is also given the primary responsibility to comply with the mandatory requirements of the Safety and Health Regulations for Long-

**13.** Another court has questioned whether §§ 343–43A should apply at all in the LHWCA context because of their incorporation of the doctrine of assumption of risk. *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863–64 n. 10 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

**14.** "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts, § 414.

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, Comment c (1965).

In *Hurst v. Triad Shipping Co., supra*, the court rejected a § 414 argument for similar reasons. The court noted that in the few opinions holding the shipowner liable for injuries suffered because of improper stevedoring operations, the "shipowners' participation in the operations is clear, direct, and of significant proportions." *Id.* at 1252 n. 38.

**15.** Of course, the duty to exercise reasonable care may not be delegated if the work to be done is "inherently dangerous". *Orr v. United States*, 486 F.2d 270 (5th Cir. 1973); Restatement (Second) of Torts § 413; W. Prosser, *Law of Torts* § 71 at 472. Appellant does not contend that loading tallow drums is inherently dangerous. *Cf. Fitzgerald v. Compania Naviera La Molinera*, 394 F.Supp. 413 (E.D.La.1975) (loading grain not inherently dangerous).

shoring, 29 C.F.R. 1918 *et seq.*[16]   These regulations require that "[s]lippery conditions shall be eliminated as they occur".   29 C.F.R. 1918.91(c).   If the shipowner is to be liable only for negligence, it would be manifestly unfair to saddle the shipowner with unfortunate results which occurred after turning the work over to the stevedore.   *Cf. Baum v. United States,* 427 F.2d 215, 219 (5th Cir. 1970) (pre-amendments case where the shipowner was not in control of maintenance operations).

This court, in *Napoli v. Hellenic Lines,* 536 F.2d 505 (2d Cir. 1976), addressed the problem of an obvious and dangerous condition, and, using the standard of § 343A, found the shipowner liable.   However, *Napoli* is distinguishable on at least two important grounds.[17]   First, the defect in *Napoli* was present when the stevedore began its duties.   Here, the defect was not present when the longshoremen began work, but arose as the work progressed.   Appellant argues that the danger was present when the work began because the failure to provide sufficient dunnage created a defect before loading began.   However, no evidence in the record indicates that Royal created the danger by failing to provide dunnage.   Merely turning over the CHIRON without sufficient dunnage (a fact

only developed during the stevedore's loading), did not create an open and obvious danger.   The ship had some dunnage available when the work began, and Northeast did not even request more dunnage until after the work had well progressed.   In spite of the request for more dunnage, the stevedore ordered the work to continue.   The delay in providing dunnage resulted only in the slippery conditions continuing after they were initially created by the stevedore.   The shipowner had no duty to supervise the stevedore to determine if conditions were safe for the longshoremen to continue work until that equipment should arrive.

Second, the shipowner in *Napoli* was acting as its own stevedore.   The majority opinion glosses over this fact in a footnote, but the distinction is critically important.   Because the shipowner acted as its own stevedore, *Napoli* did not involve consideration of § 409 which provides the standard of care for delegation of responsibility to the independent contractor, the stevedore.

One of the major premises behind the holding in *Napoli* is that when the shipowner acts as its own stevedore, the longshoremen cannot stop work when a dangerous condition arises which is the fault of the shipowner/stevedore.[18]   If they did stop

---

**16.** "The responsibility for compliance with the regulations of this part is placed upon 'employers' . . .." 29 C.F.R. § 1918.2(a). It is clear from 29 C.F.R. § 1918.2(b) that the regulation only applies to stevedores and not to shipowners:

> "It is not the intent of the regulations of this part to place additional responsibilities or duties on owners, operators, agents or masters of vessels unless such persons are acting as employers, nor is it the intent of those regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom."

Even under the LHWCA before the 1972 Amendments, the general principle was that "liability for failure to comply with safety regulations should be imposed on the party exposing the injured employee to the dangerous condition". *Brock v. Coral Drilling, Inc.,* 477 F.2d 211, 215 (5th Cir. 1973). *See Burrage v. Flota Merchante Grancolombiana, S.A.,* 431 F.2d 1229 (5th Cir. 1970).

**17.** This opinion does not take issue with *Napoli* because that case, on its facts, is little related to the problem here involved.

**18.** The importance of this fact apparently arises from Illustration 5 to § 343A, where a person employed in an office slipped over a slippery waxed stairway whose condition was open and obvious. In that case she walked because "[h]er only alternative to taking the risk was to forego her employment". In that situation the Restatement would permit the injured employee to recover in a negligence action against the office building owner. That is precisely the situation in *Napoli,* but quite unlike the situation here, where the longshoremen could stop work at any time.

The House Report did note that "nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." 3 U.S. Code Cong. & Admin.News 4698, 4704 (1972). The illustration concerning slippery conditions, immediately following this statement, may be

work, the longshoremen might face dismissal. *Napoli, supra* at 509. When an independent contractor is the stevedore, the longshoremen can stop work without fear of losing their jobs. If a condition is found to be unsafe for the longshoremen, the stevedore can remedy the difficulty at the expense of the shipowner, and if the operations are delayed, the shipowner must normally pay for standby time. *See Ramirez v. Toko Kaiun K.K.*, 385 F.Supp. 644 (N.D. Cal.1974), *Hugev v. Dampskisaktieselskabet International*, 170 F.Supp. 601 (S.D.Cal. 1959), *affirmed*, 274 F.2d 875 (9th Cir. 1960).

In *Munoz*, this court cited the Fifth Circuit case of *Gay v. Ocean Transport* in distinguishing *Napoli*:

" * * * We therefore prefer [to *Napoli*] the guidance afforded by *Gay v. Ocean Transport & Trading*, 546 F.2d 1233 (5th Cir. 1977) where, in two related cases, the Fifth Circuit refused to hold a shipowner liable for injuries sustained by longshoremen as a direct result of their employers' negligence in failing properly to ventilate the hold and omitting adequately to secure pallets on the ship's deck. The Court recognized, as we do, that it would be inimical to the intent of Congress to charge the shipowner with the stevedore's wrong." (citations omitted) 553 F.2d at 841.

In *Munoz* the defect was latent, but in *Guerra v. Bulk Transport Corp.*, the companion case to *Gay*, a longshoreman was injured when wooden pallets, stacked near a boom by the longshoremen, were struck by the boom and fell injuring plaintiff. The Fifth Circuit upheld the district court's determination that the shipowner was not negligent. The court stated:

"Even though the crew of the vessel was aware of the dangerous condition presented by the stack of pallets, it was the stevedore who created the hazard in the first place and it was the stevedore that failed to tie the pallets down and

then carelessly knocked one into the hold. This was not the type of danger that must be faced notwithstanding knowledge." *Id.* at 1242.

In applying § 343A, cases have found the shipowner not liable for obviously dangerous conditions, whether existing before control is relinquished to the stevedore or arising later with the knowledge of the shipowner, if the danger is such that the stevedore would be expected to correct the condition in discharging its responsibility. to the longshoremen and the condition is one where the shipowner could defer to the competence of the stevedore. *See Riddle v. Exxon Transportation Company, supra; Anuszewski v. Dynamic Mariners Corp., Panama*, 540 F.2d 757 (4th Cir. 1976); *Frasca v. Prudential-Grace Lines, Inc.*, 394 F.Supp. 1092 (D.Md.1975). One commentator has explained these decisions:

"The consistent philosophy of these decisions is that in the ordinary situation shipowners are in no position to learn of unsafe conditions or methods arising during the stevedore's operations; when shipowners do learn of such dangers, ordinarily the stevedore and his employees will have an equal or greater awareness, so that the danger can be said to be open and obvious; and that the safety of stevedoring and other such operations is the primary and usually the sole responsibility of the stevedore." Robertson, "Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Workers' Compensation Act", 7 Jour. of Mar. Law and Comm. 447, 473 (1976).

Here, the plaintiff and the other longshoremen did discover and realize the danger, as did their supervisors. The entire loading operation, having been put under the sole control of the stevedore, the shipowner was under no duty to countermand the stevedore's order nor even had a right

---

read to indicate that this responsibility relates mainly to the condition of the ship itself, not the activities of the stevedore. "[G]iven the congressional concern about eliminating nondelegable duties, the quoted sentence could not

possibly have been intended to establish a shipowner's duty to supervise such activities." *Hurst v. Triad Shipping Co., supra* at 1249–50 n. 35.

to do so. Furthermore, "the stevedore's employees were in a far better position to abate the danger than any of the members of the ship's crew". *Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331, 334 (5th Cir. 1977).

## IV.

### CONCLUSION

The stevedoring operation having been entrusted solely to the stevedore, it had the responsibility—not the ship—of observing the conditions of the loading as it progressed. It was Ashley [stevedore's employee] who saw that "grease is everyplace" and that because of the grease "the men couldn't hold the drums sufficiently to really store them, it was unsafe". (42a). It was Ashley who said "the stevedore says that the ship—that the Dutch had ordered the lumber and it hadn't arrived so we had to continue working until it get there". (50a).

When, as here, the work was in the control of an independent stevedore, the condition arose as a result of the stevedore and longshoremen themselves, the shipowner had taken steps to provide the requested dunnage, and the stevedore ordered the loading operation to proceed, the district court committed no error in removing the case from the jury and directing a verdict. Holding the shipowner liable on a "should anticipate" basis would allow the burden of safety to be shifted from the stevedore to the shipowner—a result not intended by Congress. The shipowner had no reason to anticipate, even taking the evidence most favorable to the plaintiff, that neither the stevedore nor the longshoremen themselves, would take sufficient measures to protect the longshoremen from slippery conditions, which they knew existed and which were a normal component of this type of loading operation.

A careful reading of the record discloses no fact upon which negligence by the shipowner, even by inference, could be based. The proof is clear, as found by the trial court, that

"[t]here is no evidence whatsoever that those in charge of the vessel were pressuring the longshoremen to continue work without interruption, so that, for example, the vessel might sail with the tide or in accordance with a prearranged schedule. The decision to continue work, in the face of a known hazard, and despite the knowledge that the requested additional dunnage was on the way, was made by the stevedoring supervisors; and that decision was neither requested nor participated in by the defendant or its officers." (79a).

When the longshoremen discovered that the loading operation required more dunnage, the shipowner set about to obtain it. As the trial court found,

"[d]efendant had no reason to anticipate that the longshoremen would not await the additional dunnage, which would have enabled them to avoid the hazard; and there is no evidence that defendant's efforts to obtain more dunnage, in order to correct the danger, were less than they could have been in the circumstances." (footnote omitted) (81a).

Upon the facts presented in plaintiff's case, the trial court's conclusion is inescapable that "[a] jury could not find for plaintiff on this state of the record without departing from the guiding principles of the statute." (footnote omitted) (81a).

For these reasons, I believe that the decision of the majority is contrary to the statute, the clearly-expressed intent of the Congress, the many decisions from the Third, Fourth, Fifth and Ninth Circuits, as well as the carefully considered decision of this court in *Munoz*: "To hold otherwise, in our view, risks return to the concept of liability without fault for shipowners, which Congress so emphatically and recently rejected". 553 F.2d at 841. In summary, in my opinion, the majority reached "a result [which] would judicially revive the longshoremen's remedy for unseaworthiness, the very remedy that Congress repudiated through the 1972 Amendments to the Long-

shoremen's and Harbor Workers' Compensation Act." [19]

Therefore, I would affirm.

19.  *Frasca v. Prudential Grace Lines, Inc., supra,* 394 F.Supp. at 1102 (granting judgment n.o.v.).