Jack A. DOCA and Fannie C. Doca, Plaintiffs,

v.

MARINA MERCANTE NICARAGUENSE S.A. and Pittston Stevedoring Corp., Defendants.

No. 75 Civ. 5312 (KTD).

United States District Court, S. D. New York.

July 11, 1979.

Zimmerman & Zimmerman, New York City, for plaintiffs Martin Lassoff, New York City, of counsel.

Cichanowicz & Callan, New York City, for defendant Marina Mercante Nicaraguense, S.A.; George T. Delaney, New York City, of counsel.

Simon & White, New York City, for defendant Pittston Stevedoring Corp.; Kenneth Horwitz, New York City, of counsel.

OPINION

KEVIN THOMAS DUFFY, District Judge:

The plaintiff, Jack A. Doca, sues the defendants Marina Mercante Nicaraguense, S.A. [hereinafter referred to as "Marina"] and Pittston Stevedoring Corporation [hereinafter referred to as "Pittston"] for personal injuries sustained by him on the M/V Costa Rica on July 23, 1975. Plaintiff Fannie C. Doca, Jack Doca's wife, sues both defendants for loss of consortium and Marina and Pittston have cross-claimed against each other. This case was originally brought as a diversity action and a jury impanelled, but at the close of the plaintiffs' case, upon motion of defendant Marina, the jury was discharged and the matter transferred to the admiralty jurisdiction of the court.

FACTS

Jack Doca was employed as a longshoreman until a serious accident at work in 1950 left him temporarily paralyzed. Doca remained hospitalized after that accident for nearly two years, finally overcoming his paralysis and returning home. Shortly after being released from the hospital, Doca fathered his first child and in 1957 a second child was born to the Docas.

In 1962 Jack Doca obtained employment with Hamilton Terminal Company as a cargo checker, work considerably less strenuous than his previous position as a longshoreman. Although a checker's job does not normally require him to leave the docks, Doca was sent aboard the M/V Costa Rica at about 2:00 p. m. on the afternoon of July 23, 1975 to determine if a particular load of cargo belonged on the ship. At the time, cargo from the dock was being loaded into the ship's # 1, # 2 and # 4 hatches by Pittston employees.

Doca boarded the Costa Rica at the gangway between the ship's # 2 and # 3 hatches and proceeded to hatch # 2. After being told by the hatch boss that the cargo did not belong in hatch # 2, Doca went along the offshore side of hatch # 3 toward the ship's # 4 hatch. As Doca approached hatch # 4 he found the passageway between the hatch coaming and the ship's outer railing blocked with refuse from the stevedoring operations. According to Doca, pipe, planks of wood and various piles of

garbage laid along the ship's outer railing with dunnage paper covering the rest of the deck up to the hatch coaming.

Doca's testimony as to the condition of the passageway was supported by photographs of the area and the testimony of eyewitnesses Edward Kozak, ship foreman for Pittston, and George Stafford, gangway man on the Costa Rica on the day of the accident. Kozak and Stafford, whom I found to be highly credible witnesses, also testified that the debris had been in the passageway when they reported to work on the morning of the 23rd. Although Kozak stated that he had informed both the ship's duty officer and Pittston's supervisor of the debris at about 9:30 that morning, he and Stafford agreed that no cleaning of the passageway was undertaken prior to Doca's arrival.

The accident of which Doca complains occurred as he attempted to cross through the obstructed passageway. According to his testimony at trial, Doca started to walk where it appeared that only dunnage paper covered the deck. As he did so, he stepped on an object underneath the paper, causing his ankle to give way and him to fall and strike his head against the hatch coaming.

Stafford, who was an eyewitness to the accident, quickly ran to Doca and found him lying on the deck in a dazed condition. Stafford, along with a number of Pittston employees who also came to Doca's aid, cleared the paper away from around Doca and found his foot resting on the deck next to a turnbuckle which held the pipe against the ship's outer railing. After being shown the turnbuckle, the apparent object on which he had stepped, Doca was assisted off the ship to receive medical attention.

*LIABILITY OF THE SHIPOWNER*

This action is brought pursuant to the Longshoreman's and Harbor Workers' Compensation Act, [hereinafter referred to as "LHWCA"], as amended. 33 U.S.C. 901, *et seq.* It is generally accepted that the 1972 amendments to the Act were intended to establish land based principles of negligence as the standard of care for vessels boarded by dock workers. *See, e. g., Napoli v. Tran-*

*spacific Carriers Corp.,* 536 F.2d 505 (2d Cir. 1976). Accordingly, it has been held that, analagous to the responsibilities of a landowner, a shipowner owes to business invitees, such as Doca, the duty to provide a reasonably safe place to work and consequently must exercise reasonable care to correct non-obvious unsafe conditions of which he has actual or constructive notice. *Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682 (2d Cir. 1978); see Restatement (Second) of Torts § 343. Liability has been imposed even with respect to open and obvious hazards of which the shipowner has knowledge where the hazard was of such character as to be unavoidably dangerous. *Napoli, supra;* see Restatement (Second) of Torts § 343A.

The decisions in this Circuit, however, have been markedly inconsistent with respect to the shipowner's responsibility for unsafe conditions in areas of the ship taken over by stevedoring operations. One line of cases holds that the concept of a shipowner's non-delegable duty to provide a safe place to work, akin to the seaworthiness doctrine, was abolished by the 1972 LHWCA Amendments and that the shipowner need not supervise the stevedore's operations and may rely upon the stevedore to eliminate hazards of which it has notice. *See Napoli, supra; Cox v. Elota Mercante Grancolombiana,* 577 F.2d 798 (2d Cir. 1978); *Canizzo, supra,* dissenting opinion of J. Friendly; *Lubrano v. Royal Netherlands S.S. Company,* 572 F.2d 364 (2d Cir. 1978), dissenting opinion of J. Moore. Opposed to these are decisions suggesting that a shipowner's failure to correct an unsafe condition of which it has knowledge is negligent regardless of whether the condition was in a workplace under the stevedore's primary control. *Lopez v. A/S D/S Svendborg,* 581 F.2d 319 (2d Cir. 1978); *Canizzo, supra.* Fortunately, I need not in this case attempt to resolve the uncertainties in Circuit law since I believe that Marina was negligent under either formulation of the shipowner's standard of care.

As stated above, there was credible testimony that the ship's crew had been notified

of the debris around hatch # 4. While the crew may not have had actual knowledge of the turnbuckle that lay underneath the scrap dunnage paper, they are certainly chargeable with such knowledge given that the passageway had been obstructed for at least a day prior to Doca's accident..

Since Marina must be regarded as having been aware of the concealed turnbuckle, its failure to eliminate the hazard was negligent, even under the most generous interpretation of the law, unless it was entitled to assume that Pittston would remove the debris. Not surprisingly, Marina argues that such an assumption on its part was fully justified. In support of its position, Marina points to the testimony of Pittston's foreman Kozak, which I found to be credible, that Pittston had actual notice of the dangerous condition and that at least some Pittston employees were working on the top of the deck around hatch # 4. Marina contends that these facts make plain that Pittston had a legal duty to remove the debris, in accordance with Occupational Safety and Health Administration [hereinafter referred to as "OSHA"] regulations requiring stevedores to keep working areas "reasonably clear of lines, bridles, dunnage and all other loose tripping or stumbling hazards." 29 C.F.R. 1918.91(a).

Marina's presentation of the facts and applicable law is crucially incomplete, however, for it disregards the evidence of an agreement between Pittston and Marina concerning removal of refuse produced by stevedoring operations. Kozak's testimony, which was supported by past bills from Pittston to Marina, was that Pittston would not remove stevedoring debris unless separately paid for the service, and that otherwise the job fell to the ship's crew. Since there was no evidence at trial that Pittston had contracted to clean on the day Doca was injured, Marina was itself obligated to remove the debris. Its argument that it justifiably relied on Pittston to clear the obstructed passageway is consequently without merit.

## LIABILITY OF STEVEDORE

█ While I have concluded that Marina was responsible for clearing the offshore passageway along the ship's # 4 hatch, I believe the evidence establishes that Pittston was concurrently negligent for allowing the passageway to remain obstructed. As noted above, Pittston received notice of the debris early in the morning on the day of the accident and there were Pittston employees working in the general vicinity of the obstructed passageway up to the time of Doca's accident. By failing to clear the passageway, Pittston plainly violated the OSHA regulations, referred to above, that require stevedores to keep work areas free of stumbling hazards.

Although Pittston's contract with Marina assigned responsibility for clearing the debris around hatch # 4 to Marina, Pittston could not by contract avoid the duties placed upon it by OSHA regulations. This is especially true in light of the evidence that Pittston allowed the passageway to remain obstructed for the better part of a day and had reason to know that Marina was delinquent in executing its responsibilities.

## CONTRIBUTORY NEGLIGENCE

█ Marina has presented as an affirmative defense the claim that Doca was contributorily negligent for attempting to cross through the debris instead of altering his path to hatch # 4. The only alternative course available to Doca, however, was along the inshore side of hatch # 3 and # 4. Although testimony at trial indicated that the inshore passageway was unobstructed, it was also established that routine safety procedures required use of the offshore passageway when inshore loading of cargo was underway. Cargo hoisted off of the dock over and into the ship's hatches would present an obvious threat to persons walking underneath. Since the evidence established that the Costa Rica's hatch #'s 1, 2 and 4 were loading inshore at the time of Doca's accident, the inshore passageway did not, in fact, present Doca with a reasonable alternative course.

■ Marina also claims that Doca was contributorily negligent for having attempted to cross through the debris without first clearing aside the dunnage paper so that he could see the deck. Such a procedure by Doca would, of course, have been safer, but Doca was required to exercise only reasonable and not the utmost care. Given that the true nature of the hazard posed by the debris was concealed, Doca's failure to stop and move aside the dunnage paper was not, under all the circumstances, negligent.

*CROSS–CLAIMS*

Since I have determined that Pittston and Marina were concurrently negligent and will allocate damages according to their proportionate degree of fault, the only issue remaining with respect to defendants' cross-claims is whether Marina is entitled to indemnity from Pittston for an alleged breach of Pittston's warranty of workmanlike performance. A shipowner's right to such indemnity was first recognized in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), where the Supreme Court held that a stevedore's contract with the shipowner contains an implied warranty of workmanlike performance, breach of which entitles the shipowner to recover for any losses caused thereby. Pointing to the OSHA regulations which, as I have found, Pittston failed to observe, Marina argues that Pittston breached its warranty and must indemnify Marina for the full amount of Marina's liability to Doca as well as the cost of its defense.

An initial question with respect to Marina's claim concerns the 1972 LHWCA Amendments' elimination of the shipowner's right to indemnity as against a stevedore-employer. 33 U.S.C. § 905(b). Although Pittston is not covered by the literal terms of the statute since it did not employ Doca, it is not at all clear that *Ryan* type indemnity survives even where the stevedore is not the injured party's employer. Certainly there is reason to believe that Congress did not intend that the deliberate allocation of financial responsibilities established by the 1972 Amendments should be contingent upon such fortuities as the identity of the plaintiff's employer. Moreover, decisions in this Circuit have suggested that the shipowner's right to *Ryan* type indemnity is compensation for and co-extensive with its absolute liability for shipboard safety under the seaworthiness doctrine. *See, e. g., Fairmount Ship. Corp. v. Chevron Internat'l Oil Co., Inc.*, 511 F.2d 1252 (2d Cir. 1975). Since the LHWCA Amendments eliminated the shipowner's seaworthiness obligation to harbor workers, the practical justification for *Ryan* indemnity in this case is open to question.

■ I need not, however, resolve this question of law, since I find that Pittston did not breach its warranty of workmanlike performance and that Marina was in any event barred from recovery by its own negligence. As discussed above, Pittston and Marina determined between themselves the responsibility for clearing refuse from stevedoring operations. Since Pittston was not, under their agreement, required to remove the debris that caused Doca's accident, its failure to do so did not violate any provision, implied or otherwise, of its contract with Marina. The fact that Pittston's performance was not in accordance with OSHA regulations, while sufficient to support a finding that Pittston was negligent, does not establish Pittston's breach of an obligation that is contractual in nature.

■ Even if it could be said that Pittston did not comply with its warranty of workmanlike performance, I believe that Marina's own negligence would preclude its recovery of indemnity. While the cases evidence some uncertainty, *compare Hurdich v. Eastmount Shipping Corp.*, 503 F.2d 397 (2d Cir. 1974) *with Rodriguez v. Olaf Pedersen's Rederi A/S*, 527 F.2d 1282 (2d Cir. 1975), the law in this Circuit appears to be that recovery of indemnity is barred where the shipowner and stevedore are concurrently negligent and the shipowner was "the party 'best situated to adopt preventive measures.'" *Lopez v. Oldendorf*, 545 F.2d 836, 839 (2d Cir. 1976). The determi-

nation of which party was in the better position to prevent a hazardous condition is a factual question, *Hurdich, supra* at 401, and in this case I think it is clear that Marina had the better opportunity to remove the debris from around hatch # 4. At the time of Doca's accident and for several hours before it, the bulk of Pittston's employees were working in the ship's hold, well removed from the obstructed passageway. The Marina's crew was well accustomed to removing refuse while stevedoring operations were underway, and indeed were contractually obligated to do so on this occasion. In light of these facts, Marina's claim for indemnity is defeated by its own negligence.

## THE CLAIM FOR LOSS OF CONSORTIUM

■ Marina has argued that Mrs. Doca's claim for damages must be denied because general maritime law does not recognize an action for loss of consortium on behalf of the wife of an injured maritime worker. As Marina has pointed out, the Second Circuit, in *Igneri v. Cie. de Transports Oceaniques,* 323 F.2d 257, *cert. denied,* 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1963), held that compensation for loss of consortium was not available to wives of maritime workers. Although a decision on point by the Court of Appeals for this Circuit would ordinarily be dispositive of the issue, I must conclude, essentially for the reasons ably stated in Judge Lasker's opinion in *Giglio v. Farrell Lines, Inc.,* 424 F.Supp. 927 (S.D.N.Y.1977), that *Igneri* can no longer be regarded as controlling.

The Court in *Igneri* reached its conclusion after an extensive review of maritime as well as common law principles concerning a wife's right to damages for loss of consortium. As Judge Lasker observed in *Giglio,* however, there have been many changes in this area of the law since 1963. Most significantly, the Supreme Court, in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), held that the wife of a seaman could sue for loss of society in a maritime wrongful death ac-

tion. After noting that the majority of state wrongful death statutes recognized such a claim, the Court concluded that its decision served to "shape the remedy to comport with the humanitarian policy of the maritime law to show 'special solicitude' for those who are injured within its jurisdiction." *Id.* at 588, 94 S.Ct. at 816.

No distinction of substance separates claims for loss of society and loss of consortium, and although the Fifth Circuit has held that a wife's consortium claim will be recognized in a maritime wrongful death action but not in a maritime action for personal injuries only, *Skidmore v. Grueninger,* 506 F.2d 716 (1975) and *Christofferson v. Halliburton Co.,* 534 F.2d 1147 (1976), it seems to me clearly more consistent with the rationale of *Gaudet* to permit the consortium claim in either case. Accordingly, Mrs. Doca is entitled to recover damages for loss of consortium attributable to her husband's accident.

## DAMAGES

Credible medical evidence at trial established that Doca suffered a cerebral concussion and a cervical spine injury as a result of his fall on the Costa Rica. Although these injuries were unquestionably serious, it was the opinion of each of the doctors who examined Doca that his present complaints, which include headaches, dizziness, pain in the shoulder and neck area, numbness in the hands and sexual dysfunction, have no clear neurological basis but are instead attributable to a post-traumatic conversion reaction, a conversion of his anxiety concerning his injuries into specific physical symptoms. It is important to note, however, that Doca's physical symptoms are no less real to him for the fact that they result from a post-traumatic conversion.

■ Along with his physical symptoms, Doca suffers from anxiety, depression, insomnia and loss of sexual appetite, which I find to be directly attributable to the accident on the Costa Rica. The combination of Doca's physical and mental ailments will, again according to credible medical evidence, likely prevent him from ever working again or from engaging in most normal recreational activities.

The parties have stipulated that Doca's medical and hospital expenses as a result of the accident are $3,697.13. In the three years prior to his accident, Doca worked an average of 47 hours a week. Assuming that he would have continued to work at that pace and taking into account subsequent adjustments in his wage scale, Doca's lost earnings from the time of the accident to the date of trial amount to $97,792.00.

Since I find that Doca will be unable to return to productive work, he is also entitled to recover for future loss of earnings. Born on May 24, 1926, Doca has a work expectancy of age 65 or approximately 12 years from the date of trial. He is thus entitled to recover $352,560, representing his future loss of earnings considering both probability of continued inflation and a discount to present value.

In calculating damages for Doca's past and future pain and suffering, I have been mindful of his previous work accident in 1950. After years of effort, Doca overcame the paralysis that followed that accident and rehabilitated himself to the point where he was able again to lead a relatively normal work and home life. Although Doca's accident aboard the Costa Rica did not cause injuries nearly as severe as those he suffered in 1950, its impact on his spirit and state of mind was understandably similar since it left him once again disabled and effectively cancelled out the great effort of his earlier rehabilitation. The medical evidence at trial indicated that prospects for improvement in either Doca's mental or physical condition are doubtful, and that he faces the likelihood of substantial physical and mental pain for the rest of his life. Taking all of these factors into account, I find that Doca is entitled to $200,000 as compensation for his pain and suffering, both past and future.

The final item of damage to be determined is Mrs. Doca's claim for loss of consortium. I found credible Mrs. Doca's testimony that she and her husband have been unable to resume normal marital relations since his accident. There was also medical evidence that Doca suffers from impotency and a loss of sexual appetite as a result of the accident. In addition to the impairment of their sexual relationship, the accident has also greatly limited the Doca's normal social activities and placed a general strain on their life together. On the basis of these factors, I find that Mrs. Doca is entitled to $15,000 as compensation for her loss of consortium.

Settle judgment on seven (7) days' notice. The judgment will apportion damages with Marina to pay 90% thereof and Pittston to pay 10% which percentages accord with the proportionate degree of fault of each.